POSADAS DE PUERTO RICO ASSOCIATES, DBA
CONDADO HOLIDAY INN *v.* TOURISM
COMPANY OF PUERTO RICO ET AL.

No. 84–1903.   Argued April 28, 1986—Decided July 1, 1986

REHNQUIST, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, POWELL, and O'CONNOR, JJ., joined. BRENNAN, J., *post*, p. 348, and STEVENS, J., *post*, p. 359, filed dissenting opinions, in which MARSHALL and BLACKMUN, JJ., joined.

*Maria Milagros Soto* argued the cause and filed briefs for appellant.

*Lino J. Saldana* argued the cause and filed a brief for appellee.*

JUSTICE REHNQUIST delivered the opinion of the Court.

In this case we address the facial constitutionality of a Puerto Rico statute and regulations restricting advertising of casino gambling aimed at the residents of Puerto Rico. Appellant Posadas de Puerto Rico Associates, doing business in Puerto Rico as Condado Holiday Inn Hotel and Sands Casino, filed suit against appellee Tourism Company of Puerto Rico in the Superior Court of Puerto Rico, San Juan Section. Ap-

---

*Briefs of *amici curiae* urging reversal were filed for the American Association of Advertising Agencies, Inc., by *David S. Versfelt* and *C. Evan Stewart;* for the American Broadcasting Companies, Inc., et al. by *Carl R. Ramey, Timothy B. Dyk, Sally Katzen, Valerie G. Schulte,* and *L. Stanley Paige;* for the American Civil Liberties Union by *M. Margaret McKeown, Burt Neuborne,* and *Charles S. Sims;* for the American Federation of Labor and Congress of Industrial Organizations by *Robert M. Weinberg, Peter O. Shinevar,* and *Laurence Gold;* for the American Newspaper Publishers Association by *P. Cameron DeVore, Marshall J. Nelson,* and *W. Terry Maguire;* and for the National Broadcasting Co., Inc., by *Floyd Abrams, Dean Ringel, Corydon B. Dunham,* and *Howard Monderer.*

Briefs of *amici curiae* were filed for the Atlantic City Casino Association by *Herbert J. Miller, Jr.,* and *David O. Stewart;* and for the Association of National Advertisers, Inc., by *Gilbert H. Weil.*

pellant sought a declaratory judgment that the statute and regulations, both facially and as applied by the Tourism Company, impermissibly suppressed commercial speech in violation of the First Amendment and the equal protection and due process guarantees of the United States Constitution.[1] The Superior Court held that the advertising restrictions had been unconstitutionally applied to appellant's past conduct. But the court adopted a narrowing construction of the statute and regulations and held that, based on such a construction, both were facially constitutional. The Supreme Court of Puerto Rico dismissed an appeal on the ground that it "d[id] not present a substantial constitutional question." We postponed consideration of the question of jurisdiction until the hearing on the merits. 474 U. S. 917 (1985). We now hold that we have jurisdiction to hear the appeal, and we affirm the decision of the Supreme Court of Puerto Rico with respect to the facial constitutionality of the advertising restrictions.

In 1948, the Puerto Rico Legislature legalized certain forms of casino gambling. The Games of Chance Act of 1948, Act No. 221 of May 15, 1948 (Act), authorized the playing of roulette, dice, and card games in licensed "gambling rooms." § 2, codified, as amended, at P. R. Laws Ann., Tit. 15, § 71 (1972). Bingo and slot machines were later added to the list of authorized games of chance under the Act. See Act of June 7, 1948, No. 21, § 1 (bingo); Act of July 30, 1974, No. 2, pt. 2, § 2 (slot machines). The legislature's intent was set forth in the Act's Statement of Motives:

---

[1] We have held that Puerto Rico is subject to the First Amendment Speech Clause, *Balzac* v. *Porto Rico*, 258 U. S. 298, 314 (1922), the Due Process Clause of either the Fifth or the Fourteenth Amendment, *Calero-Toledo* v. *Pearson Yacht Leasing Co.*, 416 U. S. 663, 668–669, n. 5 (1974), and the equal protection guarantee of either the Fifth or the Fourteenth Amendment, *Examining Board* v. *Flores de Otero*, 426 U. S. 572, 599–601 (1976). See generally *Torres* v. *Puerto Rico*, 442 U. S. 465, 468–471 (1979).

> "The purpose of this Act is to contribute to the development of tourism by means of the authorization of certain games of chance which are customary in the recreation places of the great tourist centers of the world, and by the establishment of regulations for and the strict surveillance of said games by the government, in order to ensure for tourists the best possible safeguards, while at the same time opening for the Treasurer of Puerto Rico an additional source of income." Games of Chance Act of 1948, Act No. 221 of May 15, 1948, § 1.

The Act also provided that "[n]o gambling room shall be permitted to advertise or otherwise offer their facilities to the public of Puerto Rico." § 8, codified, as amended, at P. R. Laws Ann., Tit. 15, § 77 (1972).

The Act authorized the Economic Development Administration of Puerto Rico to issue and enforce regulations implementing the various provisions of the Act. See § 7(a), codified, as amended, at P. R. Laws Ann., Tit. 15, § 76a (1972). Appellee Tourism Company of Puerto Rico, a public corporation, assumed the regulatory powers of the Economic Development Administration under the Act in 1970. See Act of June 18, 1970, No. 10, § 17, codified at P. R. Laws Ann., Tit. 23, § 671p (Supp. 1983). The two regulations at issue in this case were originally issued in 1957 for the purpose of implementing the advertising restrictions contained in § 8 of the Act. Regulation 76–218 basically reiterates the language of § 8. See 15 R. & R. P. R. § 76–218 (1972). Regulation 76a–1(7), as amended in 1971, provides in pertinent part:

> "No concessionaire, nor his agent or employee is authorized to advertise the gambling parlors to the public in Puerto Rico. The advertising of our games of chance is hereby authorized through newspapers, magazines, radio, television and other publicity media outside Puerto Rico subject to the prior editing and approval by

the Tourism Development Company of the advertisement to be submitted in draft to the Company." 15 R. & R. P. R. § 76a–1(7) (1972).

In 1975, appellant Posadas de Puerto Rico Associates, a partnership organized under the laws of Texas, obtained a franchise to operate a gambling casino and began doing business under the name Condado Holiday Inn Hotel and Sands Casino.[2] In 1978, appellant was twice fined by the Tourism Company for violating the advertising restrictions in the Act and implementing regulations. Appellant protested the fines in a series of letters to the Tourism Company. On February 16, 1979, the Tourism Company issued to all casino franchise holders a memorandum setting forth the following interpretation of the advertising restrictions:

"This prohibition includes the use of the word 'casino' in matchbooks, lighters, envelopes, inter-office and/or external correspondence, invoices, napkins, brochures, menus, elevators, glasses, plates, lobbies, banners, flyers, paper holders, pencils, telephone books, directories, bulletin boards or in any hotel dependency or object which may be accessible to the public in Puerto Rico." App. 7a.

Pursuant to this administrative interpretation, the Tourism Company assessed additional fines against appellant. The Tourism Company ordered appellant to pay the outstanding total of $1,500 in fines by March 18, 1979, or its gambling franchise would not be renewed. Appellant continued to protest the fines, but ultimately paid them without seeking judicial review of the decision of the Tourism Company. In July 1981, appellant was again fined for violating the advertising restrictions. Faced with another threatened non-

[2] The hotel was purchased in 1983 by Williams Electronics Corporation, is now organized as a public corporation under Delaware law as Posadas de Puerto Rico Associates, Inc., and does business in Puerto Rico as Condado Plaza Hotel and Casino.

renewal of its gambling franchise, appellant paid the $500 fine under protest.[3]

Appellant then filed a declaratory judgment action against the Tourism Company in the Superior Court of Puerto Rico, San Juan Section, seeking a declaration that the Act and implementing regulations, both facially and as applied by the Tourism Company, violated appellant's commercial speech rights under the United States Constitution. The Puerto Rico Secretary of Justice appeared for the purpose of defending the constitutionality of the statute and regulations. After a trial, the Superior Court held that "[t]he administrative interpretation and application has *[sic]* been capricious, arbitrary, erroneous and unreasonable, and has *[sic]* produced absurd results which are contrary to law." App. to Juris. Statement 29b. The court therefore determined that it must "override the regulatory deficiency to save the constitutionality of the statute." The court reviewed the history of casino gambling in Puerto Rico and concluded:

". . . We assume that the legislator was worried about the participation of the residents of Puerto Rico on what on that date constituted an experiment . . . . Therefore, he prohibited the gaming rooms from announcing themselves or offering themselves to the public—which we reasonably infer are the *bona fide* residents of Puerto Rico. . . . [W]hat the legislator foresaw and prohibited was the invitation to play at the casinos through publicity campaigns or advertising in Puerto Rico addressed to the resident of Puerto Rico. He wanted to protect him." *Id.*, at 32b.

Based on this view of the legislature's intent, the court issued a narrowing construction of the statute, declaring that "the

---

[3] News of the Tourism Company's decision to levy the fine against appellant reached the New Jersey Gaming Commission, and caused the Commission to consider denying a petition filed by appellant's parent company for a franchise to operate a casino in that State.

only advertisement prohibited by the law originally is that which is contracted with an advertising agency, for consideration, to attract the resident to bet at the dice, card, roulette and bingo tables." *Id.*, at 33b–34b. The court also issued the following narrowing construction of Regulation 76a–1(7):

". . . Advertisements of the casinos in Puerto Rico are prohibited in the local publicity media addressed to inviting the residents of Puerto Rico to visit the casinos.

. . . . .

"We hereby allow, within the jurisdiction of Puerto Rico, advertising by the casinos addressed to tourists, provided they do not invite the residents of Puerto Rico to visit the casino, even though said announcements may incidentally reach the hands of a resident. Within the ads of casinos allowed by this regulation figure, for illustrative purposes only, advertising distributed or placed in landed airplanes or cruise ships in jurisdictional waters and in restricted areas to travelers only in the international airport and the docks where tourist cruise ships arrive since the principal objective of said announcements is to make the tourist in transit through Puerto Rico aware of the availability of the games of chance as a tourist amenity; the ads of casinos in magazines for distribution primarily in Puerto Rico to the tourist, including the official guide of the Tourism Company 'Que Pasa in Puerto Rico' and any other tourist facility guide in Puerto Rico, even though said magazines may be available to the residents and in movies, television, radio, newspapers and trade magazines which may be published, taped, or filmed in the exterior for tourism promotion in the exterior even though they may be exposed or incidentally circulated in Puerto Rico. For example: an advertisement in the New York Times, an advertisement in CBS which reaches us through Cable TV, whose main objective is to reach the potential tourist.

"We hereby authorize advertising in the mass communication media of the country, where the trade name of the hotel is used even though it may contain a reference to the casino provided that the word casino is never used alone nor specified. Among the announcements allowed, by way of illustration, are the use of the trade name with which the hotel is identified for the promotion of special vacation packages and activities at the hotel, in invitations, 'billboards,' bulletins and programs or activities sponsored by the hotel. The use of the trade name, including the reference to the casino is also allowed in the hotel's facade, provided the word 'casino' does not exceed in proportion the size of the rest of the name, and the utilization of lights and colors will be allowed if the rest of the laws regarding this application are complied with; and in the menus, napkins, glasses, tableware, glassware and other items used within the hotel, as well as in calling cards, envelopes and letterheads of the hotel and any other use which constitutes a means of identification.

"The direct promotion of the casinos within the premises of the hotels is allowed. In-house guests and clients may receive any type of information and promotion regarding the location of the casino, its schedule and the procedure of the games as well as magazines, souvenirs, stirrers, matchboxes, cards, dice, chips, T-shirts, hats, photographs, postcards and similar items used by the tourism centers of the world.

"Since a *clausus* enumeration of this regulation is unforeseeable, any other situation or incident relating to the legal restriction must be measured in light of the public policy of promoting tourism. If the object of the advertisement is the tourist, it passes legal scrutiny." *Id.*, at 38b–40b.

The court entered judgment declaring that appellant's constitutional rights had been violated by the Tourism Company's past application of the advertising restrictions, but that

the restrictions were not facially unconstitutional and could be sustained, as "modified by the guidelines issued by this Court on this date."[4]  *Id.*, at 42b.

The Supreme Court of Puerto Rico dismissed appellant's appeal of the Superior Court's decision on the ground that it "d[id] not present a substantial constitutional question." *Id.*, at 1a.   See P. R. Laws Ann., Tit. 4, § 37(a) (1978). Treating appellant's submission as a petition for a writ of review, see §§ 37(b), (g), the Supreme Court denied the petition.   One judge dissented.

We hold that we have jurisdiction to review the decision of the Supreme Court of Puerto Rico.   A federal statute, 28 U. S. C. § 1258(2), specifically authorizes an appeal to this Court from a decision of the Supreme Court of Puerto Rico "where is drawn in question the validity of a statute of the Commonwealth of Puerto Rico on the ground of its being repugnant to the Constitution, treaties, or laws of the United States, and the decision is in favor of its validity."   A careful review of the record in this case reveals that appellant's federal constitutional claims were adequately raised at every stage of the proceedings below.   In a letter to the Tourism Company on February 24, 1982, prior to filing suit, appellant warned that, absent a reinterpretation of the advertising restrictions by the Tourism Company, "we have no choice but to challenge in Court the constitutionality and or validity of the advertising prohibition of the Act and Regulations." App. to Juris. Statement 6h.   In its complaint, appellant claimed that the advertising restrictions "violat[ed] the constitutional rights of petitioner protected by the First Amend-

---

[4] In addition to its decision concerning the advertising restrictions, the Superior Court declared unconstitutional a regulation, 15 R. & R. P. R. § 76a–4(e) (1972), that required male casino patrons to wear dinner jackets while in the casino.   The court described the dinner jacket requirement as "basically a condition of sex" and found that the legislature "has no reasonable interest which would warrant a dissimilar classification" based on sex. See App. to Juris. Statement 35b–36b.

ment to the Constitution of the United States . . . [,] the constitutional guarantee of equal protection of the laws protected by the Constitution of the United States . . . [and] the constitutional guarantee of due process of law . . . ." *Id.*, at 4i. And in the bill of appeal to the Supreme Court of Puerto Rico, appellant claimed that the advertising restrictions violated "the First Amendment of the United States Constitution," *id.*, at 5c, along with "due process of law guaranteed by the Constitution" and "the equal protection of the laws," *id.*, at 6c.

Under Puerto Rico law, appellant had the right to appeal the Superior Court's decision to the Supreme Court of Puerto Rico on the ground that that case "involv[ed] or decid[ed] a substantial constitutional question under the Constitution of the United States." P. R. Laws Ann., Tit. 4, § 37(a) (1978). The Supreme Court's dismissal of appellant's appeal for want of "a substantial constitutional question" therefore constituted a decision on the merits in favor of the validity of the challenged statute and regulations. See *Tumey* v. *Ohio,* 273 U. S. 510, 515 (1927). In such a situation, we have jurisdiction to review the decision of the Supreme Court pursuant to 28 U. S. C. § 1258(2).

The Tourism Company argues, however, that appellant's notice of appeal was not timely filed with the Clerk of the Supreme Court of Puerto Rico,[5] in violation of Rule 53.1 of the Puerto Rico Rules of Civil Procedure. According to the Tourism Company, this flaw is fatal to appellant's right to seek review in this Court. We do not agree. The requirement under Rule 53.1 that a notice of appeal be timely filed with the clerk of the reviewing court has been held by the

_____

[5] Under Puerto Rico law, the notice of appeal apparently was due in the Clerk's Office by 5 p.m. on the 30th day following the docketing of the Superior Court's judgment. *Supreme Court of Puerto Rico Rule 48(a).* The certificate of the Acting Chief Clerk of the Supreme Court of Puerto Rico indicates that appellant's notice of appeal was filed at 5:06 p.m. on the 30th day.

Supreme Court of Puerto Rico to be nonjurisdictional. See *Morales* v. *Mendez Mas*, 109 P. R. R. 1136 (1980). In this case, the Supreme Court did not dismiss appellant's appeal on timeliness grounds, so we can only assume that the court waived the timeliness requirement, as it had the power to do. Appellant's late filing of the notice of appeal does not affect our jurisdiction.

Before turning to the merits of appellant's First Amendment claim, we must address an additional preliminary matter. Although we have not heretofore squarely addressed the issue in the context of a case originating in Puerto Rico, we think it obvious that, in reviewing the facial constitutionality of the challenged statute and regulations, we must abide by the narrowing constructions announced by the Superior Court and approved *sub silentio* by the Supreme Court of Puerto Rico. This would certainly be the rule in a case originating in one of the 50 States. See *New York* v. *Ferber*, 458 U. S. 747, 769, n. 24 (1982); *Kingsley International Pictures Corp.* v. *Regents*, 360 U. S. 684, 688 (1959). And we believe that Puerto Rico's status as a Commonwealth dictates application of the same rule. See *Calero-Toledo* v. *Pearson Yacht Leasing Co.*, 416 U. S. 663, 672–673 (1974) (noting with approval decisions of lower federal courts holding that Puerto Rico is to be deemed "sovereign over matters not ruled by the Constitution"); *Wackenhut Corp.* v. *Aponte*, 266 F. Supp. 401, 405 (PR 1966) (Puerto Rico "should have the primary opportunity through its courts to determine the intended scope of its own legislation"), aff'd, 386 U. S. 268 (1967).[6]

---

[6] A rigid rule of deference to interpretations of Puerto Rico law by Puerto Rico courts is particularly appropriate given the unique cultural and legal history of Puerto Rico. See *Diaz* v. *Gonzalez*, 261 U. S. 102, 105–106 (1923) (Holmes, J.) ("This Court has stated many times the deference due to the understanding of the local courts upon matters of purely local concern. . . . This is especially true in dealing with the decisions of a Court inheriting and brought up in a different system from that which prevails here").

Because this case involves the restriction of pure commer-
cial speech which does "no more than propose a commercial
transaction," *Virginia Pharmacy Board* v. *Virginia Citizens
Consumer Council, Inc.*, 425 U. S. 748, 762 (1976),[7] our
First Amendment analysis is guided by the general principles
identified in *Central Hudson Gas & Electric Corp.* v. *Public
Service Comm'n of New York*, 447 U. S. 557 (1980). See
*Zauderer* v. *Office of Disciplinary Counsel*, 471 U. S. 626,
637–638 (1985). Under *Central Hudson*, commercial speech
receives a limited form of First Amendment protection so
long as it concerns a lawful activity and is not misleading or
fraudulent. Once it is determined that the First Amend-
ment applies to the particular kind of commercial speech at
issue, then the speech may be restricted only if the govern-
ment's interest in doing so is substantial, the restrictions di-
rectly advance the government's asserted interest, and the
restrictions are no more extensive than necessary to serve
that interest. 447 U. S., at 566.

The particular kind of commercial speech at issue here,
namely, advertising of casino gambling aimed at the resi-
dents of Puerto Rico, concerns a lawful activity and is not

---

[7] The narrowing construction of the statute and regulations announced
by the Superior Court effectively ensures that the advertising restrictions
cannot be used to inhibit either the freedom of the press in Puerto Rico to
report on any aspect of casino gambling, or the freedom of anyone, includ-
ing casino owners, to comment publicly on such matters as legislation relat-
ing to casino gambling. See *Zauderer* v. *Office of Disciplinary Counsel*,
471 U. S. 626, 637–638, n. 7 (1985) (noting that Ohio's ban on advertising of
legal services in Dalkon Shield cases "has placed no general restrictions on
appellant's right to publish facts or express opinions regarding Dalkon
Shield litigation"); *Pittsburgh Press Co.* v. *Pittsburgh Comm'n on Human
Relations*, 413 U. S. 376, 391 (1973) (emphasizing that "nothing in our hold-
ing allows government at any level to forbid Pittsburgh Press to publish
and distribute advertisements commenting on the Ordinance, the enforce-
ment practices of the Commission, or the propriety of sex preferences in
employment"); Jackson & Jeffries, Commercial Speech: Economic Due
Process and the First Amendment, 65 Va. L. Rev. 1, 35, n. 125 (1979)
(such " 'political' dialogue is at the core of . . . the first amendment").

misleading or fraudulent, at least in the abstract.   We must therefore proceed to the three remaining steps of the *Central Hudson* analysis in order to determine whether Puerto Rico's advertising restrictions run afoul of the First Amendment. The first of these three steps involves an assessment of the strength of the government's interest in restricting the speech.   The interest at stake in this case, as determined by the Superior Court, is the reduction of demand for casino gambling by the residents of Puerto Rico.   Appellant acknowledged the existence of this interest in its February 24, 1982, letter to the Tourism Company.   See App. to Juris. Statement 2h ("The legislators wanted the tourists to flock to the casinos to gamble, but not our own people").   The Tourism Company's brief before this Court explains the legislature's belief that "[e]xcessive casino gambling among local residents . . . would produce serious harmful effects on the health, safety and welfare of the Puerto Rican citizens, such as the disruption of moral and cultural patterns, the increase in local crime, the fostering of prostitution, the development of corruption, and the infiltration of organized crime."   Brief for Appellees 37.   These are some of the very same concerns, of course, that have motivated the vast majority of the 50 States to prohibit casino gambling.   We have no difficulty in concluding that the Puerto Rico Legislature's interest in the health, safety, and welfare of its citizens constitutes a "substantial" governmental interest.   Cf. *Renton* v. *Playtime Theatres, Inc.*, 475 U. S. 41, 54 (1986) (city has substantial interest in "preserving the quality of life in the community at large").

The last two steps of the *Central Hudson* analysis basically involve a consideration of the "fit" between the legislature's ends and the means chosen to accomplish those ends.   Step three asks the question whether the challenged restrictions on commercial speech "directly advance" the government's asserted interest.   In the instant case, the answer to this question is clearly "yes."   The Puerto Rico Legislature obvi-

ously believed, when it enacted the advertising restrictions at issue here, that advertising of casino gambling aimed at the residents of Puerto Rico would serve to increase the demand for the product advertised. We think the legislature's belief is a reasonable one, and the fact that appellant has chosen to litigate this case all the way to this Court indicates that appellant shares the legislature's view. See *Central Hudson, supra,* at 569 ("There is an immediate connection between advertising and demand for electricity. Central Hudson would not contest the advertising ban unless it believed that promotion would increase its sales"); cf. *Metromedia, Inc.* v. *San Diego,* 453 U. S. 490, 509 (1981) (plurality opinion of WHITE, J.) (finding third prong of *Central Hudson* test satisfied where legislative judgment "not manifestly unreasonable").

Appellant argues, however, that the challenged advertising restrictions are underinclusive because other kinds of gambling such as horse racing, cockfighting, and the lottery may be advertised to the residents of Puerto Rico. Appellant's argument is misplaced for two reasons. First, whether other kinds of gambling are advertised in Puerto Rico or not, the restrictions on advertising of casino gambling "directly advance" the legislature's interest in reducing demand for games of chance. See *id.,* at 511 (plurality opinion of WHITE, J.) ("[W]hether onsite advertising is permitted or not, the prohibition of offsite advertising is directly related to the stated objectives of traffic safety and esthetics. This is not altered by the fact that the ordinance is underinclusive because it permits onsite advertising"). Second, the legislature's interest, as previously identified, is not necessarily to reduce demand for all games of chance, but to reduce demand for casino gambling. According to the Superior Court, horse racing, cockfighting, "picas," or small games of chance at fiestas, and the lottery "have been traditionally part of the Puerto Rican's roots," so that "the legislator could have been more flexible than in authorizing more sophisticated games

which are not so widely sponsored by the people." App. to Juris. Statement 35b. In other words, the legislature felt that for Puerto Ricans the risks associated with casino gambling were significantly greater than those associated with the more traditional kinds of gambling in Puerto Rico.[8] In our view, the legislature's separate classification of casino gambling, for purposes of the advertising ban, satisfies the third step of the *Central Hudson* analysis.

We also think it clear beyond peradventure that the challenged statute and regulations satisfy the fourth and last step of the *Central Hudson* analysis, namely, whether the restrictions on commercial speech are no more extensive than necessary to serve the government's interest. The narrowing constructions of the advertising restrictions announced by the Superior Court ensure that the restrictions will not affect advertising of casino gambling aimed at tourists, but will apply only to such advertising when aimed at the residents of Puerto Rico. See also n. 7, *infra;* cf. *Oklahoma Telecasters*

---

[8] The history of legalized gambling in Puerto Rico supports the Superior Court's view of the legislature's intent. Casino gambling was prohibited in Puerto Rico for most of the first half of this century. See Puerto Rico Penal Code, § 299, Rev. Stats. and Codes of Porto Rico (1902). The Puerto Rico Penal Code of 1937 made it a misdemeanor to deal, play, carry on, open, or conduct "any game of faro, monte, roulette, fantan, poker, seven and a half, twenty one, hoky-poky, or any game of chance played with cards, dice or any device for money, checks, credit, or other representative of value." See P. R. Laws Ann., Tit. 33, § 1241 (1983). This longstanding prohibition of casino gambling stood in stark contrast to the Puerto Rico Legislature's early legalization of horse racing, see Act of Mar. 10, 1910, No. 23, repealed, Act of Apr. 13, 1916, No. 28, see P. R. Laws Ann., Tit. 15, §§ 181–197 (1972 and Supp. 1985); "picas," see Act of Apr. 23, 1927, No. 25, § 1, codified, as amended, at P. R. Laws Ann., Tit. 15, § 80 (1972); dog racing, see Act of Apr. 20, 1936, No. 35, repealed, Act of June 4, 1957, No. 10, § 1, see P. R. Laws Ann., Tit. 15, § 231 (1972) (prohibiting dog racing); cockfighting, see Act of Aug. 12, 1933, No. 1, repealed, Act of May 12, 1942, No. 236, see P. R. Laws Ann., Tit. 15, §§ 292–299 (1972); and the Puerto Rico lottery, see J. R. No. 37, May 14, 1934, repealed, Act of May 15, 1938, No. 212, see P. R. Laws Ann., Tit. 15, §§ 111–128 (1972 and Supp. 1985).

*Assn.* v. *Crisp*, 699 F. 2d 490, 501 (CA10 1983), rev'd on other grounds *sub nom. Capital Cities Cable, Inc.* v. *Crisp,* 467 U. S. 691 (1984). Appellant contends, however, that the First Amendment requires the Puerto Rico Legislature to reduce demand for casino gambling among the residents of Puerto Rico not by suppressing commercial speech that might *encourage* such gambling, but by promulgating additional speech designed to *discourage* it. We reject this contention. We think it is up to the legislature to decide whether or not such a "counterspeech" policy would be as effective in reducing the demand for casino gambling as a restriction on advertising. The legislature could conclude, as it apparently did here, that residents of Puerto Rico are already aware of the risks of casino gambling, yet would nevertheless be induced by widespread advertising to engage in such potentially harmful conduct. Cf. *Capital Broadcasting Co.* v. *Mitchell,* 333 F. Supp. 582, 585 (DC 1971) (three-judge court) ("Congress had convincing evidence that the Labeling Act of 1965 had not materially reduced the incidence of smoking"), summarily aff'd *sub nom. Capital Broadcasting Co.* v. *Acting Attorney General,* 405 U. S. 1000 (1972); *Dunagin* v. *City of Oxford, Miss.,* 718 F. 2d 738, 751 (CA5 1983) (en banc) ("We do not believe that a less restrictive time, place and manner restriction, such as a disclaimer warning of the dangers of alcohol, would be effective. The state's concern is not that the public is unaware of the dangers of alcohol. . . . The concern instead is that advertising will unduly promote alcohol consumption despite known dangers"), cert. denied, 467 U. S. 1259 (1984).

In short, we conclude that the statute and regulations at issue in this case, as construed by the Superior Court, pass muster under each prong of the *Central Hudson* test. We therefore hold that the Supreme Court of Puerto Rico properly rejected appellant's First Amendment claim.[9]

---

[9] It should be apparent from our discussion of the First Amendment issue, and particularly the third and fourth prongs of the *Central Hudson*

Appellant argues, however, that the challenged advertising restrictions are constitutionally defective under our decisions in *Carey* v. *Population Services International*, 431 U. S. 678 (1977), and *Bigelow* v. *Virginia*, 421 U. S. 809 (1975). In *Carey*, this Court struck down a ban on any "advertisement or display" of contraceptives, 431 U. S., at 700–702, and in *Bigelow*, we reversed a criminal conviction based on the advertisement of an abortion clinic. We think appellant's argument ignores a crucial distinction between the *Carey* and *Bigelow* decisions and the instant case. In *Carey* and *Bigelow*, the underlying conduct that was the subject of the advertising restrictions was constitutionally protected and could not have been prohibited by the State. Here, on the other hand, the Puerto Rico Legislature surely could have prohibited casino gambling by the residents of Puerto Rico altogether. In our view, the greater power to

test, that appellant can fare no better under the equal protection guarantee of the Constitution. Cf. *Renton* v. *Playtime Theatres, Inc.*, 475 U. S. 41, 55, n. 4 (1986). If there is a sufficient "fit" between the legislature's means and ends to satisfy the concerns of the First Amendment, the same "fit" is surely adequate under the applicable "rational basis" equal protection analysis. See *Dunagin* v. *City of Oxford, Miss.*, 718 F. 2d 738, 752–753 (CA5 1983) (en banc), cert. denied, 467 U. S. 1259 (1984).

JUSTICE STEVENS, in dissent, asserts the additional equal protection claim, not raised by appellant either below or in this Court, that the Puerto Rico statute and regulations impermissibly discriminate between different kinds of publications. *Post*, at 359–360. JUSTICE STEVENS misunderstands the nature of the Superior Court's limiting construction of the statute and regulations. According to the Superior Court, "[i]f the object of [an] advertisement is the tourist, it passes legal scrutiny." See App. to Juris. Statement 40b. It is clear from the court's opinion that this basic test applies *regardless of whether the advertisement appears in a local or nonlocal publication.* Of course, the likelihood that a casino advertisement appearing in the New York Times will be primarily addressed to tourists, and not Puerto Rico residents, is far greater than would be the case for a similar advertisement appearing in the San Juan Star. But it is simply the demographics of the two newspapers' readerships, and not any form of "discrimination" on the part of the Puerto Rico Legislature or the Superior Court, which produces this result.

completely ban casino gambling necessarily includes the lesser power to ban advertising of casino gambling, and *Carey* and *Bigelow* are hence inapposite.

Appellant also makes the related argument that, having chosen to legalize casino gambling for residents of Puerto Rico, the legislature is prohibited by the First Amendment from using restrictions on advertising to accomplish its goal of reducing demand for such gambling. We disagree. In our view, appellant has the argument backwards. As we noted in the preceding paragraph, it is precisely *because* the government could have enacted a wholesale prohibition of the underlying conduct that it is permissible for the government to take the less intrusive step of allowing the conduct, but reducing the demand through restrictions on advertising. It would surely be a Pyrrhic victory for casino owners such as appellant to gain recognition of a First Amendment right to advertise their casinos to the residents of Puerto Rico, only to thereby force the legislature into banning casino gambling by residents altogether. It would just as surely be a strange constitutional doctrine which would concede to the legislature the authority to totally ban a product or activity, but deny to the legislature the authority to forbid the stimulation of demand for the product or activity through advertising on behalf of those who would profit from such increased demand. Legislative regulation of products or activities deemed harmful, such as cigarettes, alcoholic beverages, and prostitution, has varied from outright prohibition on the one hand, see, *e. g.*, Cal. Penal Code Ann. § 647(b) (West Supp. 1986) (prohibiting soliciting or engaging in act of prostitution), to legalization of the product or activity with restrictions on stimulation of its demand on the other hand, see, *e. g.*, Nev. Rev. Stat. §§ 244.345(1), (8) (1986) (authorizing licensing of houses of prostitution except in counties with more than 250,000 population), §§ 201.430, 201.440 (prohibiting advertising of houses of prostitution "[i]n any public theater, on the public streets of any city or town, or on any public high-

way," or "in [a] place of business").[10]   To rule out the latter, intermediate kind of response would require more than we find in the First Amendment.

Appellant's final argument in opposition to the advertising restrictions is that they are unconstitutionally vague.   In particular, appellant argues that the statutory language, "to advertise or otherwise offer their facilities," and "the public of Puerto Rico," are not sufficiently defined to satisfy the requirements of due process.   Appellant also claims that the term "anunciarse," which appears in the controlling Spanish version of the statute, is actually broader than the English term "to advertise," and could be construed to mean simply "to make known."   Even assuming that appellant's argument has merit with respect to the bare statutory language, however, we have already noted that we are bound by the Superior Court's narrowing construction of the statute. Viewed in light of that construction, and particularly with the interpretive assistance of the implementing regulations as

---

[10] See also 15 U. S. C. § 1335 (prohibiting cigarette advertising "on any medium of electronic communication subject to the jurisdiction of the Federal Communications Commission"), upheld in *Capital Broadcasting Co.* v. *Mitchell,* 333 F. Supp. 582 (DC 1971), summarily aff'd *sub nom. Capital Broadcasting Co.* v. *Acting Attorney General,* 405 U. S. 1000 (1972); Fla. Stat. § 561.42(10)–(12) (1985) (prohibiting all signs except for one sign per product in liquor store windows); Mass. Gen. Laws § 138:24 (1974) (authorizing Alcoholic Beverages Control Commission to regulate liquor advertising); Miss. Code Ann. § 67–1–85 (Supp. 1985) (prohibiting most forms of liquor sign advertising), upheld in *Dunagin* v. *City of Oxford, Miss., supra;* Ohio Rev. Code Ann. §§ 4301.03(E), 4301.211 (1982) (authorizing Liquor Control Commission to regulate liquor advertising and prohibiting off-premises advertising of beer prices), upheld in *Queensgate Investment Co.* v. *Liquor Control Comm'n,* 69 Ohio St. 2d 361, 433 N. E. 2d 138, appeal dism'd for want of a substantial federal question, 459 U. S. 807 (1982); Okla. Const., Art. 27, § 5, and Okla. Stat., Tit. 37, § 516 (1981) (prohibiting all liquor advertising except for one storefront sign), upheld in *Oklahoma Telecasters Assn.* v. *Crisp,* 699 F. 2d 490 (CA10 1983), rev'd on other grounds *sub nom. Capital Cities Cable, Inc.* v. *Crisp,* 467 U. S. 691 (1984); Utah Code Ann. §§ 32–7–26 to 32–7–28 (1974) (repealed 1985) (prohibiting all liquor advertising except for one storefront sign).

modified by the Superior Court, we do not find the statute unconstitutionally vague.

For the foregoing reasons, the decision of the Supreme Court of Puerto Rico that, as construed by the Superior Court, § 8 of the Games of Chance Act of 1948 and the implementing regulations do not facially violate the First Amendment or the due process or equal protection guarantees of the Constitution, is affirmed.[11]

*It is so ordered.*

JUSTICE BRENNAN, with whom JUSTICE MARSHALL and JUSTICE BLACKMUN join, dissenting.

The Puerto Rico Games of Chance Act of 1948, Act No. 221 of May 15, 1948, legalizes certain forms of casino gambling in Puerto Rico. Section 8 of the Act nevertheless prohibits gambling casinos from "advertis[ing] or otherwise offer[ing] their facilities to the public of Puerto Rico." § 8, codified, as amended, at P. R. Laws Ann., Tit. 15, § 77 (1972). Because neither the language of § 8 nor the applicable regulations define what constitutes "advertis[ing] or otherwise offer[ing gambling] facilities to the public of Puerto Rico," appellee Tourism Company was found to have applied the Act in an arbitrary and confusing manner. To ameliorate this problem, the Puerto Rico Superior Court, to avoid a declaration of the unconstitutionality of § 8, construed it to ban only advertisements or offerings directed to the residents of Puerto Rico, and listed examples of the kinds of advertisements that the court considered permissible under the Act. I doubt that this interpretation will assure that arbitrary and unrea-

---

[11] JUSTICE STEVENS claims that the Superior Court's narrowing construction creates an impermissible "prior restraint" on protected speech, because that court required the submission of certain casino advertising to appellee for its prior approval. See *post,* at 361. This argument was not raised by appellant either below or in this Court, and we therefore express no view on the constitutionality of the particular portion of the Superior Court's narrowing construction cited by JUSTICE STEVENS.

sonable applications of § 8 will no longer occur.[1]  However, even assuming that appellee will now enforce § 8 in a nonarbitrary manner, I do not believe that Puerto Rico constitutionally may suppress truthful commercial speech in order to discourage its residents from engaging in lawful activity.

I

It is well settled that the First Amendment protects commercial speech from unwarranted governmental regulation. See *Virginia Pharmacy Board* v. *Virginia Citizens Consumer Council, Inc.*, 425 U. S. 748, 761–762 (1976). "Commercial expression not only serves the economic interest of the speaker, but also assists consumers and furthers the societal interest in the fullest possible dissemination of information." *Central Hudson Gas & Electric Corp.* v. *Public Service Comm'n of New York*, 447 U. S. 557, 561–562 (1980). Our decisions have recognized, however, "the 'common-sense' distinction between speech proposing a commercial transaction, which occurs in an area traditionally subject to government regulation, and other varieties of speech." *Ohralik* v. *Ohio State Bar Assn.*, 436 U. S. 447, 455–456 (1978). We have therefore held that the Constitution "accords less protection to commercial speech than to other constitutionally safeguarded forms of expression." *Bolger* v. *Youngs Drug Products Corp.*, 463 U. S. 60, 64–65 (1983). Thus, while the First Amendment ordinarily prohibits regulation of speech

---

[1] Beyond the specific areas addressed by the Superior Court's "guidelines," § 8 must still be applied on a case-by-case basis; a casino advertisement "passes legal scrutiny" if "the object of the advertisement is the tourist." App. to Juris. Statement 40b. Appellee continues to insist that a newspaper photograph of appellant's slot machines constituted an impermissible "advertisement," even though it was taken at a press conference called to protest legislative action. See Brief for Appellees 48. Thus, even under the narrowing construction made by the Superior Court, appellee would interpret § 8 to prohibit casino owners from criticizing governmental policy concerning casino gambling if such speech is directed to the Puerto Rico residents who elect government officials, rather than to tourists.

based on the content of the communicated message, the government may regulate the content of commercial speech in order to prevent the dissemination of information that is false, deceptive, or misleading, see *Zauderer* v. *Office of Disciplinary Counsel*, 471 U. S. 626, 638 (1985); *Friedman* v. *Rogers*, 440 U. S. 1, 14–15 (1979); *Ohralik, supra*, at 462, or that proposes an illegal transaction, see *Pittsburgh Press Co.* v. *Pittsburgh Comm'n on Human Relations*, 413 U. S. 376 (1973). We have, however, consistently invalidated restrictions designed to deprive consumers of accurate information about products and services legally offered for sale. See *e. g., Bates* v. *State Bar of Arizona*, 433 U. S. 350 (1977) (lawyer's services); *Carey* v. *Population Services International*, 431 U. S. 678, 700–702 (1977) (contraceptives); *Linmark Associates, Inc.* v. *Willingboro*, 431 U. S. 85 (1977) (housing); *Virginia Pharmacy Board, supra* (pharmaceuticals); *Bigelow* v. *Virginia*, 421 U. S. 809 (1975) (abortions).

I see no reason why commercial speech should be afforded less protection than other types of speech where, as here, the government seeks to suppress commercial speech in order to deprive consumers of accurate information concerning lawful activity. Commercial speech is considered to be different from other kinds of protected expression because advertisers are particularly well suited to evaluate "the accuracy of their messages and the lawfulness of the underlying activity," *Central Hudson*, 447 U. S., at 564, n. 6, and because "commercial speech, the offspring of economic self-interest, is a hardy breed of expression that is not 'particularly susceptible to being crushed by overbroad regulation.'" *Ibid.* (quoting *Bates, supra*, at 381); see also *Friedman, supra*, at 10; *Virginia Pharmacy Board, supra*, at 772, n. 24. These differences, we have held, "justify a more permissive approach to regulation of the manner of commercial speech for the purpose of protecting consumers from deception or coercion, and these differences explain why doctrines designed to prevent 'chilling' of protected speech are inapplicable to commercial

speech." *Central Hudson, supra,* at 578 (BLACKMUN, J., concurring in judgment); see *Linmark Associates, Inc., supra,* at 98; *Virginia Pharmacy Board, supra,* at 772, n. 24. However, no differences between commercial and other kinds of speech justify protecting commercial speech less extensively where, as here, the government seeks to manipulate private behavior by depriving citizens of truthful information concerning lawful activities.

> "Even though 'commercial' speech is involved, [this kind of restriction] strikes at the heart of the First Amendment. This is because it is a covert attempt by the State to manipulate the choices of its citizens, not by persuasion or direct regulation, but by depriving the public of the information needed to make a free choice. . . . [T]he State's policy choices are insulated from the visibility and scrutiny that direct regulation would entail and the conduct of citizens is molded by the information that government chooses to give them." *Central Hudson, supra,* at 574–575 (BLACKMUN, J., concurring in judgment).

See also Note, Constitutional Protection of Commercial Speech, 82 Colum. L. Rev. 720, 750 (1982) ("Regulation of commercial speech designed to influence behavior by depriving citizens of information . . . violates basic [First Amendment] principles of viewpoint- and public-agenda-neutrality"). Accordingly, I believe that where the government seeks to suppress the dissemination of nonmisleading commercial speech relating to legal activities, for fear that recipients will act on the information provided, such regulation should be subject to strict judicial scrutiny.

## II

The Court, rather than applying strict scrutiny, evaluates Puerto Rico's advertising ban under the relaxed standards normally used to test government regulation of commercial speech. Even under these standards, however, I do not

believe that Puerto Rico constitutionally may suppress all casino advertising directed to its residents. The Court correctly recognizes that "[t]he particular kind of commercial speech at issue here, namely, advertising of casino gambling aimed at the residents of Puerto Rico, concerns a lawful activity and is not misleading or fraudulent." *Ante,* at 340–341. Under our commercial speech precedents, Puerto Rico constitutionally may restrict truthful speech concerning lawful activity only if its interest in doing so is substantial, if the restrictions directly advance the Commonwealth's asserted interest, and if the restrictions are no more extensive than necessary to advance that interest. See *Zauderer, supra,* at 638; *In re R. M. J.,* 455 U. S. 191, 203 (1982); *Central Hudson, supra,* at 564. While tipping its hat to these standards, the Court does little more than defer to what it perceives to be the determination by Puerto Rico's Legislature that a ban on casino advertising aimed at residents is reasonable. The Court totally ignores the fact that commercial speech is entitled to substantial First Amendment protection, giving the government unprecedented authority to eviscerate constitutionally protected expression.

## A

The Court asserts that the Commonwealth has a legitimate and substantial interest in discouraging its residents from engaging in casino gambling. According to the Court, the legislature believed that " '[e]xcessive casino gambling among local residents . . . would produce serious harmful effects on the health, safety and welfare of the Puerto Rican citizens, such as the disruption of moral and cultural patterns, the increase in local crime, the fostering of prostitution, the development of corruption, and the infiltration of organized crime.' " *Ante,* at 341 (quoting Brief for Appellees 37). Neither the statute on its face nor the legislative history indicates that the Puerto Rico Legislature thought that serious harm would result if residents were allowed to engage in

casino gambling;[2] indeed, the available evidence suggests exactly the opposite. Puerto Rico has legalized gambling casinos, and permits its residents to patronize them. Thus, the Puerto Rico Legislature has determined that permitting residents to engage in casino gambling will not produce the "serious harmful effects" that have led a majority of States to ban such activity. Residents of Puerto Rico are also permitted to engage in a variety of other gambling activities—including horse racing, "picas," cockfighting, and the Puerto Rico lottery—all of which are allowed to advertise freely to residents.[3] Indeed, it is surely not farfetched to suppose

[2] The Act's Statement of Motives says only that "[t]he purpose of this Act is to contribute to the development of tourism by means of the authorization of certain games of chance . . . and by the establishment of regulations for and the strict surveillance of said games by the government, in order to ensure for tourists the best possible safeguards, while at the same time opening for the Treasurer of Puerto Rico an additional source of income." Games of Chance Act of 1948, Act No. 221 of May 15, 1948, § 1. There is no suggestion that discouraging residents from patronizing gambling casinos would further Puerto Rico's interests in developing tourism, ensuring safeguards for tourists, or producing additional revenue.

[3] The Court seeks to justify Puerto Rico's selective prohibition of casino advertising by asserting that "the legislature felt that for Puerto Ricans the risks associated with casino gambling were significantly greater than those associated with the more traditional kinds of gambling in Puerto Rico." *Ante*, at 343. Nothing in the record suggests that the legislature believed this to be the case. Appellee has failed to show that casino gambling presents risks different from those associated with other gambling activities, such that Puerto Rico might, consistently with the First Amendment, choose to suppress only casino advertising directed to its residents. Cf. *Metromedia, Inc.* v. *San Diego*, 453 U. S. 490, 534, n. 12 (1981) (BRENNAN, J., concurring in judgment) (The First Amendment "demands more than a rational basis for preferring one kind of commercial speech over another"); *Schad* v. *Mount Ephraim*, 452 U. S. 61, 73 (1981) ("The [government] has presented no evidence, and it is not immediately apparent as a matter of experience, that live entertainment poses problems . . . more significant that those associated with various permitted uses"). For this reason, I believe that Puerto Rico's selective advertising ban also violates appellant's rights under the Equal Protection Clause. In rejecting appellant's equal protection claim, the Court erroneously uses a "rational basis"

that the legislature chose to restrict casino advertising not because of the "evils" of casino gambling, but because it preferred that Puerto Ricans spend their gambling dollars on the Puerto Rico lottery. In any event, in light of the legislature's determination that serious harm will *not* result if residents are permitted and *encouraged* to gamble, I do not see how Puerto Rico's interest in discouraging its residents from engaging in casino gambling can be characterized as "substantial," even if the legislature had actually asserted such an interest which, of course, it has not. Cf. *Capital Cities Cable, Inc.* v. *Crisp*, 467 U. S. 691, 715 (1984) (Oklahoma's selective regulation of liquor advertising "suggests limits on the substantiality of the interests it asserts"); *Metromedia, Inc.* v. *San Diego*, 453 U. S. 490, 532 (1981) (BRENNAN, J., concurring in judgment) ("[I]f billboards alone are banned and no further steps are contemplated or likely, the commitment of the city to improving its physical environment is placed in doubt").

The Court nevertheless sustains Puerto Rico's advertising ban because the legislature *could* have determined that casino gambling would seriously harm the health, safety, and welfare of the Puerto Rican citizens. *Ante*, at 344.[4] This

analysis, thereby ignoring the important First Amendment interests implicated by this case. Cf. *Police Dept. of Chicago* v. *Mosley*, 408 U. S. 92 (1972).

[4] The Court reasons that because Puerto Rico could legitimately decide to prohibit casino gambling entirely, it may also take the "less intrusive step" of legalizing casino gambling but restricting speech. *Ante*, at 346. According to the Court, it would "surely be a strange constitutional doctrine which would concede to the legislature the authority to totally ban [casino gambling] but deny to the legislature the authority to forbid the stimulation of demand for [casino gambling]" by banning advertising. *Ibid.* I do not agree that a ban on casino advertising is "less intrusive" than an outright prohibition of such activity. A majority of States have chosen not to legalize casino gambling, and we have never suggested that this might be unconstitutional. However, having decided to legalize casino gambling, Puerto Rico's decision to ban truthful speech concerning entirely lawful activity raises serious First Amendment problems. Thus,

reasoning is contrary to this Court's long-established First Amendment jurisprudence. When the government seeks to place restrictions upon commercial speech, a court may not, as the Court implies today, simply speculate about valid reasons that the government might have for enacting such restrictions. Rather, the government ultimately bears the burden of justifying the challenged regulation, and it is incumbent upon the government to *prove* that the interests it seeks to further are real and substantial. See *Zauderer*, 471 U. S., at 641; *In re R. M. J.*, 455 U. S., at 205–206; *Friedman*, 440 U. S., at 15. In this case, appellee has not shown that "serious harmful effects" will result if Puerto Rico residents gamble in casinos, and the legislature's decision to legalize such activity suggests that it believed the opposite to be true. In short, appellees have failed to show that a substantial government interest supports Puerto Rico's ban on protected expression.

## B

Even assuming that appellee could show that the challenged restrictions are supported by a substantial governmental interest, this would not end the inquiry into their constitutionality. See *Linmark Associates*, 431 U. S., at 94; *Virginia Pharmacy Board*, 425 U. S., at 766. Appellee must still demonstrate that the challenged advertising ban directly advances Puerto Rico's interest in controlling the harmful effects allegedly associated with casino gambling. *Central Hudson*, 447 U. S., at 564. The Court proclaims that Puerto Rico's legislature "obviously believed . . . that advertising of casino gambling aimed at the residents of Puerto Rico would serve to increase the demand for the product advertised." *Ante*, at 341–342. However, even assuming that an advertising ban would effectively reduce resi-

---

the "constitutional doctrine" which bans Puerto Rico from banning advertisements concerning lawful casino gambling is not so strange a restraint—it is called the First Amendment.

dents' patronage of gambling casinos,[5] it is not clear how it would directly advance Puerto Rico's interest in controlling the "serious harmful effects" the Court associates with casino gambling. In particular, it is unclear whether banning casino advertising aimed at residents would affect local crime, prostitution, the development of corruption, or the infiltration of organized crime. Because Puerto Rico actively promotes its casinos to tourists, these problems are likely to persist whether or not residents are also encouraged to gamble. Absent some showing that a ban on advertising aimed only at residents will directly advance Puerto Rico's interest in controlling the harmful effects allegedly associated with casino gambling, Puerto Rico may not constitutionally restrict protected expression in that way.

## C

Finally, appellees have failed to show that Puerto Rico's interest in controlling the harmful effects allegedly associated with casino gambling "cannot be protected adequately by more limited regulation of appellant's commercial expression." *Central Hudson, supra,* at 570. Rather than suppressing constitutionally protected expression, Puerto Rico could seek directly to address the specific harms thought to be associated with casino gambling. Thus, Puerto Rico could continue carefully to monitor casino operations to guard against "the development of corruption, and the infiltration of organized crime." *Ante,* at 341. It could vigorously enforce its criminal statutes to combat "the increase in local crime [and] the fostering of prostitution." *Ibid.* It could establish limits on the level of permissible betting, or promulgate addi-

---

[5] Unlike the Court, I do not read the fact that appellant has chosen to litigate the case here to necessarily indicate that appellant itself believes that Puerto Rico residents would respond to casino advertising. In light of appellees' arbitrary and capricious application of § 8, appellant could justifiably have believed that, notwithstanding the Superior Court's "narrowing" constuction, its First Amendment rights could be safeguarded effectively only if the Act was invalidated on its face.

tional speech designed to discourage casino gambling among residents, in order to avoid the "disruption of moral and cultural patterns," *ibid.*, that might result if residents were to engage in excessive casino gambling. Such measures would directly address the problems appellee associates with casino gambling, while avoiding the First Amendment problems raised where the government seeks to ban constitutionally protected speech.

The Court fails even to acknowledge the wide range of effective alternatives available to Puerto Rico, and addresses only appellant's claim that Puerto Rico's legislature might choose to reduce the demand for casino gambling among residents by "promulgating additional speech designed to *discourage* it." *Ante,* at 344. The Court rejects this alternative, asserting that "it is up to the legislature to decide whether or not such a 'counterspeech' policy would be as effective in reducing the demand for casino gambling as a restriction on advertising." *Ibid.* This reasoning ignores the commands of the First Amendment. Where the government seeks to restrict speech in order to advance an important interest, it is not, contrary to what the Court has stated, "up to the legislature" to decide whether or not the government's interest might be protected adequately by less intrusive measures. Rather, it is incumbent upon the government to *prove* that more limited means are not sufficient to protect its interests, and for a *court* to decide whether or not the government has sustained this burden. See *In re R. M. J.,* *supra,* at 206; *Central Hudson, supra,* at 571. In this case, nothing suggests that the Puerto Rico Legislature ever considered the efficacy of measures other than suppressing protected expression. More importantly, there has been no showing that alternative measures would inadequately safeguard the Commonwealth's interest in controlling the harmful effects allegedly associated with casino gambling. Under

these circumstances, Puerto Rico's ban on advertising clearly violates the First Amendment.[6]

The Court believes that Puerto Rico constitutionally may prevent its residents from obtaining truthful commercial speech concerning otherwise lawful activity because of the effect it fears this information will have. However, "[i]t is precisely this kind of choice between the dangers of suppressing information, and the dangers of its misuse if it is freely available, that the First Amendment makes for us." *Virginia Pharmacy Board*, 425 U. S., at 770. "[T]he people in our democracy are entrusted with the responsibility for judging and evaluating the relative merits of conflicting arguments." *First National Bank* v. *Bellotti*, 435 U. S. 765, 791 (1978). The First Amendment presupposes that "people will perceive their own best interests if only they are well enough informed, and . . . the best means to that end is to open the channels of communication, rather than to close them." *Virginia Pharmacy Board, supra,* at 770. "[I]f there be any danger that the people cannot evaluate . . . information . . . it is a danger contemplated by the Framers of the First Amendment." *Bellotti, supra,* at 792; see also *Central Hudson,* 447 U. S., at 562 ("[T]he First Amendment presumes that some accurate information is better than no information at all"). Accordingly, I would hold that Puerto Rico may not suppress the dissemination of truthful information about entirely lawful activity merely to keep its residents ignorant. The Court, however, would allow Puerto Rico to do just that, thus dramatically shrinking the scope of First Amendment protection available to commercial speech, and giving government officials unprecedented authority to

---

[6] The Court seeks to buttress its holding by noting that some States have regulated other "harmful" products, such as cigarettes, alcoholic beverages, and legalized prostitution, by restricting advertising. While I believe that Puerto Rico may not prohibit all casino advertising directed to its residents, I reserve judgment as to the constitutionality of the variety of advertising restrictions adopted by other jurisdictions.

eviscerate constitutionally protected expression.    I respect-
fully dissent.

JUSTICE STEVENS, with whom JUSTICE MARSHALL and
JUSTICE BLACKMUN join, dissenting.

The Court concludes that "the greater power to completely
ban casino gambling necessarily includes the lesser power
to ban advertising of casino gambling."    *Ante*, at 345–346.
Whether a State may ban all advertising of an activity that it
permits but could prohibit—such as gambling, prostitution,
or the consumption of marijuana or liquor—is an elegant
question of constitutional law.    It is not, however, appropri-
ate to address that question in this case because Puerto
Rico's rather bizarre restraints on speech are so plainly for-
bidden by the First Amendment.

Puerto Rico does not simply "ban advertising of casino
gambling."    Rather, Puerto Rico blatantly discriminates in
its punishment of speech depending on the publication, audi-
ence, and words employed.    Moreover, the prohibitions, as
now construed by the Puerto Rico courts, establish a regime
of prior restraint and articulate a standard that is hopelessly
vague and unpredictable.

With respect to the publisher, in stark, unabashed lan-
guage, the Superior Court's construction favors certain iden-
tifiable publications and disfavors others.    If the publication
(or medium) is from outside Puerto Rico, it is very favored
indeed.    "Within the ads of casinos allowed by this regula-
tion figure . . . movies, television, radio, newspapers, and
trade magazines which may be published, taped, or filmed in
the exterior for tourism promotion in the exterior even
though they may be exposed or incidentally circulated in
Puerto Rico.    For example: an advertisement in the New
York Times, an advertisement in CBS which reaches us
through Cable TV, whose main objective is to reach the po-
tential tourist."    App. to Juris. Statement 38b–39b.    If the
publication is native to Puerto Rico, however—the San Juan
Star, for instance—it is subject to a far more rigid system of

restraints and controls regarding the manner in which a certain form of speech (casino ads) may be carried in its pages. Unless the Court is prepared to uphold an Illinois regulation of speech that subjects the New York Times to one standard and the Chicago Tribune to another, I do not understand why it is willing to uphold a Puerto Rico regulation that applies one standard to the New York Times and another to the San Juan Star.

With respect to the audience, the newly construed regulations plainly discriminate in terms of the intended listener or reader. Casino advertising must be "addressed to tourists." *Id.*, at 38b. It must not "invite the residents of Puerto Rico to visit the casino." *Ibid.* The regulation thus poses what might be viewed as a reverse privileges and immunities problem: Puerto Rico's residents are singled out for disfavored treatment in comparison to all other Americans.[1] But nothing so fancy is required to recognize the obvious First Amendment problem in this kind of audience discrimination. I cannot imagine that this Court would uphold an Illinois regulation that forbade advertising "addressed" to Illinois residents while allowing the same advertiser to communicate his message to visitors and commuters; we should be no more willing to uphold a Puerto Rico regulation that forbids advertising "addressed" to Puerto Rico residents.

With respect to the message, the regulations now take one word of the English language—"casino"—and give it a special opprobrium. Use of that suspicious six-letter word is permitted only "where the trade name of the hotel is used even though it may contain a reference to the casino." *Id.*, at 39b. The regulations explicitly include an important provision—

---

[1] Perhaps, since Puerto Rico somewhat ambivalently regards a gambling casino as a good thing for the local proprietor and an evil for the local patrons, the ban on local advertising might be viewed as a form of protection against the poison that Puerto Rico uses to attract strangers into its web. If too much speech about the poison were permitted, local residents might not only partake of it but also decide to prohibit it.

"that the word casino is never used alone nor specified." *Ibid.* (The meaning of "specified"—perhaps italicization, or boldface, or all capital letters—is presumably left to subsequent case-by-case adjudication.) Singling out the use of a particular word for official sanctions raises grave First Amendment concerns, and Puerto Rico has utterly failed to justify the disfavor in which that particular six-letter word is held.

With respect to prior restraint, the Superior Court's opinion establishes a regime of censorship. In a section of the opinion that the majority fails to include, *ante,* at 335, the court explained:

> "We hereby authorize the publicity of the casinos in newspapers, magazines, radio, television or any other publicity media, of our games of [chance] in the exterior *with the previous approval of the Tourism Company* regarding the text of said ad, which must be submitted in draft to the Company. Provided, however, that no photographs, or pictures may be approval of the Company." App. to Juris. Statement 38b (emphasis added).

A more obvious form of prior restraint is difficult to imagine.

With respect to vagueness, the Superior Court's construction yields no certain or predictable standards for Puerto Rico's suppression of particular kinds of speech. Part of the problem lies in the delineation of permitted speech in terms of the audience to which it is addressed. The Puerto Rico court stated that casino ads within Puerto Rico are permissible "provided they do not invite the residents of Puerto Rico to visit the casino, even though such announcements may incidentally reach the hands of a resident." *Id.,* at 38b. At oral argument, Puerto Rico's counsel stated that a casino advertisement in a publication with 95% local circulation—perhaps the San Juan Star—might actually be permissible, so

long as the advertisement "is addressed to tourists and not to residents." Tr. of Oral Arg. 26. Then again, maybe not. Maybe such an ad would not be permissible, and maybe there would be considerable uncertainty about the nature of the required "address." For the Puerto Rico court was not particularly concerned with the precise limits of the oddly selective ban on public speech that it was announcing. The court noted: "Since a *clausus* enumeration of this regulation is unforeseeable, any other situation or incident relating to the legal restriction must be measured in light of the public policy of promoting tourism." App. to Juris. Statement 40b. And in a passage that should chill, not only would-be speakers, but reviewing courts as well, the Superior Court expressly noted that there was nothing immutable about its supposedly limiting and saving construction of the restraints on speech: "These guide-regulations may be amended in the future by the enforcing agency pursuant to the dictates of the changing needs and in accordance with the law and what is resolved herein." *Id.*, at 42b.[2]

---

[2] The unpredictable character of the censorship envisioned by the Superior Court is perhaps illustrated by its decision, apparently *sua sponte*, Tr. of Oral Arg. 43, to invalidate a regulation that required male patrons of casinos to wear dinner jackets. See *ante*, at 337, n. 4. The Superior Court explained:

"The classification that we do find suspicious, and which came to our attention during the course of this cause of action, *ACAA* v. *Enrique Bird Pinero*, C. A. 1984 Number 46, is the one made in section 4(e) of the Gaming Regulation (15 R. R. P. R. Sec. 76–a4[e]) requiring that the male tourist wear a jacket within the casino. On one hand, Puerto Rico is a tropical country. Adequate informal wear, such as the guayabera, is in tune with our climate and allows the tourist to enjoy himself without extreme, and in our judgment unconstitutional, restrictions on his stay on the Island. On the other hand, said requirement does not improve at all the elegant atmosphere that prevails in our casinos, since the male player may be forced to wear a horribly sewn jacket, so prepared to prevent people from taking them, which to a certain point is degrading for the man and discriminatory, since women are allowed into the casino without any type of requirement for formal wear. The Honorable Supreme Court in *Figueroa Ferrer*,

The general proposition advanced by the majority today—that a State may prohibit the advertising of permitted conduct if it may prohibit the conduct altogether—bears little resemblance to the grotesquely flawed regulation of speech advanced by Puerto Rico in this case.[3]  The First Amendment surely does not permit Puerto Rico's frank discrimination among publications, audiences, and words.   Nor should sanctions for speech be as unpredictable and haphazardous as the roll of dice in a casino.

I respectfully dissent.

---

*supra*, stated: 'parliaments are not the only necessary agents of social change' and 'when you try to maintain a constitutional scheme alive, to preserve it in harmony with the realities of a country, the court's principal duty is to legislate towards that end, with the tranquility and circumspection which its role within our governmental system demands, without exceeding the framework of its jurisdiction.'   To save the constitutionality of the Law under our consideration, we must bend the requirement of formal wear since this is basically a condition of sex and the State has no reasonable interest which would warrant a dissimilar classification."   App. to Juris. Statement 35b–36b.

Apparently, the Superior Court felt that Puerto Rico's unique brand of local censorship, like the guayabera, was "in tune" with Puerto Rico's climate; it is the obligation of this Court, however, to evaluate the regulations from a more universal perspective.

[3] Moreover, the Court has relied on an inappropriate major premise. The fact that Puerto Rico might prohibit all casino gambling does not necessarily mean that it could prohibit residents from patronizing casinos that are open to tourists.   Even under the Court's reasoning, discriminatory censorship cannot be justified as a less restrictive form of economic regulation unless discriminatory regulation is itself permissible.