NATIONAL FUNERAL SERVICES, INC., a West Virginia corporation, Plaintiff–Appellant,

v.

John D. ROCKEFELLER, IV, Governor of the State of West Virginia; State of West Virginia; the West Virginia Department of Labor, a department of the State of West Virginia; Lawrence Barker, Commissioner of the Department of Labor of the State of West Virginia, Defendants–Appellees,

and

Amos Quesenberry, an individual; Richard Quesenberry, an individual; Rose & Quesenberry Funeral Home, Inc., a West Virginia Corporation; Thomas Seavers, an individual; Seavers Funeral Home, Inc., a West Virginia Corporation; The WV Funeral Directors Association, a West Virginia Association; Roger Price, Executive Director of the West Virginia Funeral Directors Association, a West Virginia Association; Joseph Christian, an individual; Melvin T. Strider Company, Incorporated; Colonial Funeral Homes; Eackles Funeral Home, Incorporated; Robert Spencer, an individual, Defendants.

No. 88–3945.

United States Court of Appeals, Fourth Circuit.

Argued Nov. 3, 1988.

Decided March 7, 1989.

Rehearing In Banc Denied June 1, 1989.

Robert Stephen Kiss (John A. Hutchinson, Earl Kent Hellems, Gorman, Sheatsley & Hutchinson, L.C., on brief) for plaintiff-appellant.

Ann Adair Spaner, Sr. Asst. Atty. Gen (Charles G. Brown, Atty. Gen., Thomas L. Hindes, Deputy Atty. Gen., and Mark D. Kindt, Asst. Atty. Gen., on brief) for defendants-appellees.

Before HALL, Circuit Judge, BUTZNER, Senior Circuit Judge, and KISER, United States District Judge for the Western District of Virginia, sitting by designation.

K.K. HALL, Circuit Judge:

In this declaratory judgment action, National Funeral Services ("NFS") appeals the district court's judgment, which upheld the constitutionality of *W.Va.Code* § 47–14–1 *et seq.* (1983) and found that the Act's provisions were not preempted by the Federal Trade Commission's ("FTC") Funeral Rule, 16 C.F.R. 453. On somewhat different reasoning, we affirm.

I.

This case revolves around the State of West Virginia's attempt to regulate preneed funeral contracts, codified at W.Va. Code § 47–14–1 *et seq.* (1983).[1] These contracts have been tightly regulated in the state since 1955, when the West Virginia legislature found them to be void and against public policy unless all of the contract proceeds were placed in trust, pending the contract beneficiary's time of need. *W.Va.Code* 47–14–1 (as amended in 1965, 1983). Unlike other states that have chosen to regulate these contracts through regulation of the funeral service profession, *see Guardian Plans v. Teague*, 870 F.2d 123 (4th Cir.1989) (Virginia), West Virginia's regulatory scheme focuses on the methods of sale and the terms of the contracts themselves.

The statute establishes a comprehensive regulation of all preneed sales of burial goods, funeral goods, or funeral services,[2] and declares preneed contracts void unless they are drafted, solicited, and executed according to its dictates. *W.Va.Code* § 47–14–1 (1983). It regulates all sellers of such goods and services and requires that they be licensed by the state. *Id.* § 47–14–3. Likewise, all agents or employees of a seller, who participate in the sale of these contracts, must be state certified. *Id.* § 47–14–4.

---

1. The statute provides its own definition of "preneed funeral contracts":

 "Preneed funeral contract" means any contract, agreement, mutual understanding, series or combination of contracts, agreements and mutual understandings, other than a contract of insurance, under which, for a specified consideration paid in advance of death in a lump sum or by installments, a person promises to furnish or make available or provide funeral services, funeral goods or burial goods for use at a time determinable by the death of the "contract beneficiary" who is either named or implied.

 W.Va.Code § 47–14–2(12) (1983).

2. These three terms are words of art defined by the statute. See *W.Va.Code* § 47–14–2(1), (7), (8) (1983). Roughly speaking, they encompass every good and service necessary from a corpse's initial preparation to its final entombment. Goods and services provided by cemeteries acting as such, however, are exempted from regulation. Such unregulated sales can encompass cemetery lots, markers, crypts, urns, or incidental related services. Nonetheless, cemeteries that attempt to provide other non-excluded goods and services on a preneed basis are subject to regulation.

While the general advertisement of these contracts is not restricted, in an attempt to reduce fraud and preserve privacy, the statute prohibits in-person and telephonic solicitation of prospective purchasers in nursing homes, hospitals, and private residences, as well as the solicitation of relatives of persons near death. *Id.* § 47–14–10. Once a sale is made, the statute establishes elaborate procedures for entrusting the proceeds of the sale [3] and for the disposition of the trust income. *Id.* § 47–14–5, 8. Also, the Act requires that a seller provide the promised services at the contract price, regardless of whether the price of the services at the time of need exceeds the trust corpus. *Id.* § 47–14–7. This price guarantee also requires that if the goods and services cost less than the proceeds, the difference must be refunded to the purchaser. *Id.* Finally, a contract must be revocable at all times by a purchaser, while only revocation for nonpayment is available to a seller. *Id.* § 47–14–6.

Consistent with its purpose of protecting consumers, the Act creates a civil remedy, complete with attorney fees, for any breach of its provisions. Further, criminal penalties are available for anyone who mishandles contract proceeds. *Id.* 47–14–8.

It is obvious from this exhaustive regulatory scheme, as well as the express language of the statute itself, that the West Virginia legislature considers these contracts to be a threat to the consuming public. *Id.* § 47–14–10(e). Through its police powers, it has allowed them to exist only under carefully circumscribed conditions. It is from this perspective that we must view NFS's challenges.

NFS entered the preneed funeral service market in West Virginia in 1980. At that time, the trust requirements [4] of the statute had been ruled unconstitutional by an inferior state court. Consequently, NFS began its sales operation without having to comply with the statute's current measures. However, in 1982, the West Virginia Supreme Court of Appeals reinstated the statute's trust requirements, finding them fully constitutional. *Whitener v. W.Va. Bd. of Embalmers and Funeral Directors*, 169 W.Va. 513, 288 S.E.2d 543 (1982).

In the wake of this decision, the West Virginia legislature, in 1983, substantially overhauled the statute to create the comprehensive regulatory framework present today. Prior to these amendments, many aspects of the regulation were not present, including the solicitation restrictions. Shortly after this overhaul, NFS filed suit.

In the court below, NFS contended that the statute was preempted by federal regulation, challenged several aspects of the statute's constitutionality, and sought a preliminary injunction against its implementation. NFS also alleged various antitrust claims against the West Virginia Funeral Director's Association and several individual funeral directors. Finding the potential for irreparable injury to NFS, the lower court granted a temporary restraining order and a preliminary injunction pending the final adjudication of the constitutional claims.

After a long period of posturing and negotiation, the antitrust claims were eventually settled and the case proceeded to a bench trial on the challenges to the statute. The district court upheld the statute in all respects.[5] This appeal followed.

## II.

NFS's first contention is that the Funeral Rule, promulgated by the FTC, so pervasively regulates the funeral industry that it preempts West Virginia's extensive regulation of preneed funeral contracts. NFS's alternate contention is that the statute's prohibition of unrequested, in-home

---

3. The current statute requires that only 90% of contract proceeds be entrusted.

4. Between 1965 and 1983, W.Va.Code § 47–14–1, *et seq.* (1983) required that 95% of preneed contract proceeds be entrusted.

5. In the proceedings below, this case was consolidated with another suit brought by Mountain State Funeral Association, a nonprofit corporation that sold preneed funeral contracts. Mountain State did not appeal the district court's decision.

personal and telephonic solicitation violates its right to free commercial speech.[6] We address the preemption question first.

Beginning in 1972, the FTC conducted an extensive, nationwide investigation into funeral practices. What the investigation revealed was widespread fraudulent sales practices and a general reluctance of funeral directors to disclose the individual prices of the goods and services they marketed as packages. *Harry and Bryant Co. v. FTC,* 726 F.2d 993, 999–1001 (4th Cir.1984), *cert. denied* 469 U.S. 820, 105 S.Ct. 91, 83 L.Ed.2d 37. In response to this national problem, the FTC promulgated the Funeral Rule, found at 16 C.F.R. § 453. The goal of the rule "is to lower existing barriers to price competition in the funeral market and to facilitate informed consumer choice." 47 Fed.Reg. 42260 (Sept. 24, 1982). It proscribes several fraudulent sales practices and mandates the pre-sale disclosure of prices to consumers. Specifically, it requires the disclosure of prices to consumers who request such information over the telephone. 16 C.F.R. § 453.2(b)(1)(i). Notably, the rule does not focus on the preneed funeral market, but on the much larger at-need market.

The gist of appellant's preemption argument is that the trusting requirements of the Act, coupled with its prohibitions on solicitation, make it impossible for appellant to profitably stay in business. Thus, the argument goes, this regulation insulates the marketplace from NFS's competition and, consequently, restricts the widespread dissemination of funeral price and product information mandated by the FTC's Funeral Rule. Appellant maintains that the Act's prohibition of door-to-door and telephone solicitation is particularly opposed to the strong public policy behind the Funeral Rule. We find this argument unpersuasive.

In determining whether federal regulation preempts concurrent state regulation, three inquiries are relevant: (1) whether the federal regulation is so pervasive that it is reasonable to assume that Congress did not intend for state regulation; (2) whether the field regulated is an area of such dominant federal interest that preclusion of state regulation must be assumed, and; (3) whether simultaneous enforcement of the state regulation raises the serious danger of conflict with the federal program. *Commonwealth of Pennsylvania v. Nelson,* 350 U.S. 497, 502–05, 76 S.Ct. 477, 480–82, 100 L.Ed. 640 (1956). This test, applied to the case at hand, clearly shows that West Virginia's regulation is not preempted.

First, we note that the Funeral Rule is a limited regulation focusing on fraudulent sales practices and price disclosure. 47 Fed.Reg. 42260–61 (Sept. 24, 1982). It simply does not attempt a comprehensive regulation of the funeral industry. Furthermore, there is no language in the Funeral Rule that even alludes to an intent to preempt state regulation in the area it does cover. In fact, the Rule expressly states that where a state law is applicable to any transaction that the Rule covers, and that state law affords at least the same level of protection to consumers that federal law provides, the Rule will not be in effect in that state. 16 C.F.R. § 453.9. Thus, not only is the Funeral Rule not a preemptive, pervasive regulation of the funeral industry, it actually encourages concurrent state regulation.

While it is obvious that federal regulation does not preclude West Virginia's regulation, we must address appellant's contention that these two regulatory schemes are in conflict. Clearly, they are not. Both strive to protect consumers. To the extent that the Funeral Rule regulates pre-

---

**6.** In the court below, NFS also argued that the Act's exemption from regulation of cemeteries, its restrictions on commercial speech, and its 90% trusting requirement were so irrational and arbitrary that they could not withstand due process/equal protection scrutiny. *See New Orleans v. Dukes,* 427 U.S. 297, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976). The district court properly rejected this feckless argument. We need not address this issue though, because appellant conceded at oral argument that it was without merit. *See also Whitener, supra* (West Virginia court ruled that exemption of cemeteries and 95% trusting requirement in predecessor statute were constitutional).

need funeral contracts at all, it merely mandates the disclosure of price information and forbids unfair sales practices. West Virginia's statute likewise attempts to curb fraudulent overreaching by curtailing the solicitation of vulnerable people who are hospitalized or institutionalized or in the sanctuary of their own homes. *W.Va.Code* § 47–14–10(e) (1983). Likewise, the state's prohibition of *unrequested* telephone solicitation does not conflict with the Funeral Rule's mandate that price information be given over the phone when *requested* by consumers. And, we do not even see a connection, let alone a conflict, between the Funeral Rule and the West Virginia Act's trusting requirements.[7] Therefore, we conclude that W.Va.Code § 47–14–1 *et seq.* (1983) was not preempted by federal regulation.

### III.

Appellant's first amendment challenges focus on the Act's ban on uninvited door-to-door and telephone solicitation:

(a) Any contract seller or agent or employee or person acting in behalf of any such person may not: ...

(5) Solicit by telephone call or by visit to a personal residence, unless such solicitation has been previously requested by the person solicited or by a family member residing at such residence.[8]

*Id.* § 47–14–10(a)(5). Appellant contends that this provision is an unconstitutionally broad, content-based prohibition of its legitimate commercial speech. It maintains that the government interests of preventing overreaching by preneed salesmen and protecting the privacy interests of consumers can be furthered by less onerous restrictions. In particular, appellant points to *W.Va.Code* § 46A–2–132 (1974)—which provides that a consumer may cancel any in-home sale within 72 hours—to argue that the state's interest in preventing fraud is already adequately protected. As to the government's assertion that these prohibitions protect privacy, appellant maintains that even if privacy were protected by the restrictions, they are too broad to survive first amendment scrutiny. Appellant amplifies its argument in regard to the ban on telemarketing, positing that the perceived risks of overreaching and invasion of privacy inherent in personal solicitation, which could possibly justify the door-to-door ban, are simply not present when sales are conducted over the telephone. We address

**7.** To the extent that appellant argues that these requirements prevent it from operating profitably, and thus, lead to an anti-competitive market, it failed to prove its case below. The trial court specifically found that "preneed sales businesses can be operated in compliance with the statute at a profit by the exercise of good business practices." As a finding of fact, we cannot overturn this conclusion unless it is clearly erroneous, however, we are spared this decision because appellant does not challenge the finding on appeal. Consequently, we must assume that this argument is not supported by the evidence.

**8.** The statute also proscribes solicitation in several other situations. Appellant does not contest these provisions:

(a) Any contract seller or agent or employee or person acting in behalf of any such person may not:

(1) Directly or indirectly call upon individuals or persons in hospitals, rest homes, nursing homes or similar institutions for the purpose of soliciting preneed funeral contracts or making funeral or final disposition arrangements without first having been specifically requested by such person to do so; ...

(3) Solicit relatives of persons whose death is apparently pending or whose death has recently occurred for the purpose of providing funeral services, final disposition, burial or funeral goods for such person;

(4) Solicit or accept or pay any consideration for recommending or causing a dead human body to be provided funeral services and funeral and burial goods by specific persons, or the services of a specific crematory, mausoleum or cemetery except where such arrangement is the subject of a preneed funeral contract;....

(d) Anyone making a personal or written solicitation for a preneed funeral contract shall, at the very first instance, divulge the real reason for the contract or solicitation.

(e) The department may adopt rules regulating the solicitation of preneed contracts by certificate holders or registrants to protect the public from solicitation practices which utilize undue influence or which take undue advantage of a person's ignorance or emotional vulnerability. (1983, c. 161).

this argument point-by-point.[9]

■ The trial court rejected appellant's position that these restrictions were content-based and upheld them on the theory that they were permissible time, place, and manner restrictions. The district court reasoned that the prohibitions did not turn on the content of appellant's solicitation, but rather on the places appellant chose to solicit. Although this analysis is facially appealing, I believe that it cannot withstand closer examination.[10]

■ The essence of time, place, and manner restrictions is content neutrality. The disregard of content is why such restrictions are given more deferential review than are other speech restraints. *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 106 S.Ct. 925, 928, 89 L.Ed.2d 29 (1986). Their intent is not to influence what a speaker has to say, only when, where, or how he says it. Their focus is on the effects of the act of speaking, not on the information conveyed by the speech. *Id.* 106 S.Ct. at 930.

In one sense, the restrictions in question do not regulate the content of appellant's solicitation—it may make any sales pitch it pleases—they merely dictate where and how appellant may make its pitch. However, in a more fundamental sense, these restrictions are content-based. That is, only solicitors who attempt to speak about preneed funeral contracts are restricted. Thus, even though the statute restricts only the manner and places appellant may solicit business, it turns on the type of business appellant solicits. Therefore, I cannot adopt the trial court's reasoning and shall carefully scrutinize this statute as a content-based restriction.

### IV.

■ Before beginning this analysis, I pause to note that both parties agree that the speech in issue is purely commercial. As such, although protected by the first amendment, that protection is limited. *Posadas de Puerto Rico Assoc. v. Tourism Co.*, 478 U.S. 328, 340, 106 S.Ct. 2968, 2976, 92 L.Ed.2d 266 (1986); *Project 80's Inc. v. City of Pocatello*, 857 F.2d 592, 595 (9th Cir.1988). It is beyond question "that the Constitution accords less protection to com-

---

9. We reject the dissent's suggestion that because we have upheld the 90% trust requirement, the appellant's first amendment challenges are mooted. This position is premised on the erroneous view that appellant was driven out of business by the trust requirement alone and has made that the centerpiece of its case. Appellant made it perfectly clear at oral argument, however, that its first amendment challenges were fundamental to this dispute:

> Judge Butzner: You have to fund 90%?
> Appellant: Yes, your Honor.
> Judge Butzner: And you want to hold that's unconstitutional.
> Appellant: No, your Honor. No, we submitted an argument which in part we felt that the 90% was irrational. We have no problem at all with the concept, with the requirement or need of trusting.
> Judge Butzner: Well, I don't understand. You don't agree that 90% trusting is constitutional, do you?
> Appellant: Your honor, we submitted what I believe is a very minor part of our case that we believe that it was an irrational decision on the part of the legislature. There were numerous actuarial studies, some of which in our record which reflect that 50% of the cost is much more than adequate to find these promises. That's the only part there, it's a very minor point.

> Judge Butzner: All right.
> Later, the argument turned to the first amendment questions:
> Judge Hall: But they (salesmen) go into the home in person or by telephone, unsolicited?
> Appellant: Yes they do, your Honor.
> Judge Hall: That's the point of this case, that's what your suit is about.
> Appellant: Yes, your Honor.
> Judge Hall: That is the case.
> Appellant: That's the first amendment argument, that's the jewel to this case, that's the central argument.

10. As Judge Kiser notes in his concurrence, although we both reach the same result, that this statute is constitutional; we do so through different reasoning. I cannot concur in Judge Kiser's conclusion that this statute effects time, place, and manner restrictions because it relies too heavily on a false premise, that this statute regulates the funeral profession. A careful reading of the statute shows that it applies to "any person," not just members of the funeral profession. Therefore, even though I believe professional solicitation cases are closely analogous, see n. 11 *infra*, I do not believe that they are so closely analogous that traditional commercial speech analysis should not apply. Thus, the following discussion reflects only my own view of the statute's constitutionality.

mercial speech than to other constitutionally safeguarded forms of expression." *Bolger v. Young's Drug Products Corp.*, 463 U.S. 60, 64–65, 103 S.Ct. 2875, 2878–79, 77 L.Ed.2d 469 (1983). And, it is equally well settled that the potential for deception and invasion of privacy inherent in some forms of commercial speech can, and has, justified content-based restrictions. *Curtis v. Thompson*, 840 F.2d 1291, 1298 (7th Cir. 1988). Furthermore, these restrictions can certainly be based on the place and manner of the expression, because the protection due commercial speech often turns on the nature of its expression. *Central Hudson Gas v. Public Service Comm. of N.Y.*, 447 U.S. 557, 563, 100 S.Ct. 2343, 2350, 65 L.Ed. 2d 341 (1980). As the Supreme Court has observed, "when the particular content or method of the advertising suggests that it is inherently misleading or when experience has proved that in fact such advertising is subject to abuse, the States may impose appropriate restrictions." *In re R.M.J.*, 455 U.S. 191, 203, 102 S.Ct. 929, 937, 71 L.Ed.2d 64 (1982).

These principles of law make clear that scrutiny of this statute must be guided by the "common sense" distinction between commercial speech and noncommercial speech. *Virginia Pharmacy Bd. v. Virginia Citizens Consumer Council*, 425 U.S. 748, 771 n. 24, 96 S.Ct. 1817, 1830 n. 24, 48 L.Ed.2d 346 (1976). First amendment jurisprudence has evolved the disparity of treatment between the two for a reason:

> To require a parity of constitutional protection for commercial and noncommercial speech alike could invite dilution, simply by a leveling process, of the force of the Amendment's guarantee with respect to the latter kind of speech. Rather than subject the First Amendment to such a devitalization, we instead have afforded commercial speech a limited measure of protection, commensurate with its subordinate position in the scale of First Amendment values, while allowing modes of regulation that might be impermissible in the realm of noncommercial expression.

*Ohralik v. Ohio State Bar Assoc.*, 436 U.S. 447, 456, 98 S.Ct. 1912, 1918, 56 L.Ed.2d

444 (1978). It is with this view of commercial speech, properly placed in its constitutional context, that I undertake my analysis.

Review of this statute is guided by the four-part test enunciated in *Central Hudson, supra:*

> At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest.

*Id.* at 566, 100 S.Ct. at 2351.

Turning to the facts of this case, the state has not contended that appellant's solicitations were in any way fraudulent or misleading. Therefore, I must conclude that appellant's speech is legitimate commercial speech, which is protected by the first amendment.

Likewise, I have no difficulty in concluding that the government interests furthered by these restrictions are substantial. The most obvious of these interests is the protection of consumers from overreaching and high pressure sales tactics of this most unique product. *W.Va.Code* § 47–14–10(e) (1983). Directly speaking, the subject of these contracts is funeral arrangement; indirectly speaking, their subject is death— the death of the buyer, or one close to him. This topic is obviously one charged with emotion and one fraught with the potential for overreaching by solicitors. In promulgating the funeral rule, FTC noted that the extremely sensitive nature of this subject in part necessitated its regulation:

> While the arrangement of a funeral is clearly an important financial transaction for consumers, it is a unique transaction, one whose characteristics reduce the ability of consumers to make careful, informed purchase decisions.

47 Fed.Reg. 42260 (Sept. 24, 1982). Similarly, the West Virginia legislature has found these contracts so troublesome that by law they are void unless drawn to the legislative specifications. *W.Va.Code* § 47–14–1 (1983). I concur that in regulating the sales of these contracts the protection of consumers is a substantial state interest.

An equally substantial interest underlying this statute is the protection of the privacy of the home. *Project 80's supra,* at 596; *Curtis, supra,* at 1299–1300. The Supreme Court has recently reiterated its willingness to preserve the sanctity of the private home:

> "The State's interest in protecting the well-being, tranquility, and privacy of the home is certainly of the highest order in a free and civilized society." Our prior decisions have often remarked on the unique nature of the home, "the last citadel of the tired, the weary, and the sick," and have recognized that "preserving the sanctity of the home, the one retreat to which men and women can repair to escape from the tribulations of their daily pursuits, is surely an important value."

*Frisby v. Schultz,* —— U.S. ——, ——, 108 S.Ct. 2495, 2502, 101 L.Ed.2d 420 (1988) (citations omitted). While I cannot improve on this eloquent defense of the home, I must add that in this context, the solicitation for the funeral arrangements of the individual or a family member, appellant's speech is particularly intrusive. The discussion of the death of a family member can be a disquieting experience when done with a loved one, let alone when done with a perfect stranger who uninvitedly knocks on your door, or calls on your phone. I

believe that West Virginia's ban on solicitation is supported by the substantial interest of protecting privacy.

The next inquiry is whether this ban directly advances these interests. The potential for fraudulent overreaching in the sale of these contracts is at its greatest when the consumer is confronted by a salesman:

> Unlike a public advertisement, which simply provides information and leaves the recipient free to act upon it or not, in-person solicitation may exert pressure and often demands an immediate response, without providing an opportunity for comparison or reflection. The aim and effort of in-person solicitation may be to provide a one-sided presentation and to encourage speedy and perhaps uninformed decisionmaking....

*Ohralik, supra,* 436 U.S. at 457, 98 S.Ct. at 1919 (discussing solicitation by attorneys).[11] And, as the Supreme Court has recently noted, in-person solicitation is "a practice rife with possibilities for overreaching, invasion of privacy, the exercise of undue influence, and out-right fraud." *Shapero v. Kentucky Bar Assoc.,* —— U.S. ——, ——, 108 S.Ct. 1916, 1922, 100 L.Ed.2d 475 (1988) (attorney solicitation). Thus, I believe the statute clearly advances both of the state's legitimate interests insofar as it bans door-to-door solicitation. *See May v. People,* 636 P.2d 672 (Colo.1981) (en banc).[12]

Likewise, I am persuaded that the state's prohibition of telemarketing furthers its interests. This conclusion is reached upon consideration of the three aspects of in-person solicitation that the Supreme Court recently found troublesome in *Shapero.*[13]

---

**11.** My reliance on *Ohralik* and other attorney solicitation cases should not be taken as an indication that I do not appreciate the distinction between typical commercial solicitation and attorney solicitation. However, I believe that the unique nature of the product in this case, makes these attorney cases closely analogous. In both, an advocate trained in the art of persuasion is trying to convince an emotionally vulnerable layperson that he needs professional services.

**12.** The fact that W.Va.Code § 46A–2–132 (1983) also provides protection to consumers by allow-

ing unilateral cancellation of in-home sale contracts does not diminish this conclusion. The West Virginia legislature can certainly provide extra protection to its citizenry in the sale of this unique product.

**13.** As this discussion makes clear, my reasoning concerns telemarketing performed by salespersons. I have not considered the issue of whether telemarketing performed by an automated message player would pose the same risks.

144

The first of these is that personal solicitation is inherently more difficult to regulate. This is so because the solicitation is "not visible or otherwise open to public scrutiny," *Id.* —— U.S. at ——, 108 S.Ct. at 1922, thus making it nearly impossible for the state to keep tabs on its content. In contrast, written solicitations are much more easily regulated because the sales pitch is preserved in the advertisement itself. *Id.* Plainly, telemarketing is similar to in-person solicitation in this regard and poses the same threat of undetectable fraudulent and deceptive sales practices.

The second problematic aspect of personal solicitation is that it presents a much greater threat of overreaching or undue influence because of "the coercive force of the personal presence of a trained advocate." *Id.* Clearly, a salesman's presence over the telephone is less persuasive than it is in person, but just as clearly, it is more persuasive than a written solicitation. A written solicitation cannot adapt to a consumer's responses, it cannot change its sales pitch to exploit particular vulnerabilities, and it cannot press the reluctant buyer. Thus, although the opportunities for overreaching in telemarketing are not as great as they are in door-to-door solicitation, they are certainly greater than those present in direct mail or other advertising.

Finally, in-person solicitations may be appropriately regulated because of their invasion of a consumer's privacy. While this reason was certainly alluded to by the *Shapero* court, *Id.*, it was articulated more artfully in the *Ohralik* opinion:

Unlike the reader of an advertisement, who can "effectively avoid further bombardment of [his] sensibilities simply by averting [his] eyes," the target of the solicitation may have difficulty avoiding being importuned and distressed even if the lawyer seeking employment is entirely well meaning.

**14.** I reject appellant's contention that because other salesmen are allowed to solicit at private residences, this statute's limited proscriptions cannot possibly further the state's interests in any significant way. Rather, it is obvious that West Virginia's limited prohibitions reflect that

*Id.* 436 U.S. at 466, n. 25, 98 S.Ct. at 1923, n. 25.

Unlike direct mail solicitations that can be readily distinguished and easily discarded, a recipient of telephone solicitation must answer the phone to determine who is calling, and must risk an uncomfortable confrontation to rid himself of the solicitor. Further, it is beyond dispute that this most sensitive product makes an uninvited telephone call even more upsetting, especially when it invades the privacy of the home. In the words of one commentator, "[t]he telephone is an instrument with a unique capacity to intrude. Note, *Give Me A Home Where No Salesmen Phone: Telephone Solicitation and the First Amendment*, 7 Hastings Const. L.Q. 129. Thus, like in-person solicitation, telemarketing poses a very real threat to the privacy of a consumer's home. Consequently, because I conclude that telemarketing is in many ways analogous to in-person solicitation, I believe that the state's prohibition of it furthers the state's interests.[14]

I turn to the last step of the analysis, the determination of whether the statute sweeps more broadly than necessary to achieve the state's interests. The *Central Hudson* Court phrased this inquiry as whether the statute is more extensive than necessary to serve the state interests. *Id.* 447 U.S. at 566, 100 S.Ct. at 2351. Other circuits have interpreted this phrase to mean that before a statute can pass first amendment muster, it must be the least restrictive alternative available to the state. *Project 80's, supra* at 596–97; *Fox v. Board of Trustees*, 841 F.2d 1207, 1213–14 (2nd Cir.1988) *cert. granted*, —— U.S. ——, 109 S.Ct. 52, 102 L.Ed.2d 31 (1988). I disagree.

 Such a rigorous interpretation is not supported by the type of speech in issue. If this statute restrained speech concerning "core" first amendment matters, this "least restrictive alternative" standard would be

its legislature acted in a way respectful of the balancing of interests necessary whenever freedom of expression is limited. It attempted to regulate only those solicitations that it has determined to pose the greatest threat to its legitimate interests.

appropriate. This statute, however, regulates purely commercial speech, speech not worthy of the first amendment's fullest protection. *Ohralik, supra,* 436 U.S. at 456, 98 S.Ct. at 1918; *Posadas, supra,* 106 S.Ct. at 2976 (a "limited form" of protection). In commercial matters, an area traditionally subject to government regulation, *Virginia Pharmacy, supra,* 425 U.S. at 771 n. 24, 96 S.Ct. at 1830 n. 24, more deference is due the legislature than this stringent level of review allows. *Posadas, supra,* 478 U.S. at 343-44, 106 S.Ct. at 2978-79. This reasoning is especially appropriate in this case, where the commercial speech concerns a matter that the state legislature has comprehensively regulated as a threat to the consuming public. Therefore, in review of this statute, I do not believe that courts should engage in a speculative search for the least restrictive alternative. Rather, a provision should be upheld as long as the state has chosen a reasonable means of regulation that is not excessive in view of its legitimate interests. *See American Future Systems v. Pa. State Univ.,* 752 F.2d 854, 865-66 (3rd Cir. 1984), *cert. denied,* 473 U.S. 911, 105 S.Ct. 3537, 87 L.Ed.2d 660.

In making this determination, a court should view the anti-solicitation statute as a whole. West Virginia has demonstrated that two substantial interests underlie this statute, the protection of its people from fraud and the protection of its people's privacy. To further these interests, the legislature has restricted appellant's speech in a few specific situations that it identified as particularly prone to these problems—when the consumer is in a hospital, in a nursing home, confronted by the death of a loved one, or in the privacy of his own home. *W.Va.Code,* § 47–14–10 (1983). Similarly, the legislature has prohibited only two limited forms of speech that it felt posed special threats to the state's interests—uninvited in-person solicitation and telemarketing. Out of this scheme, appellant challenges only the

state's restraint on in-home solicitation. I find it to be constitutional.

In making this finding, I place great weight on the alternatives left open by the statute:

(b) Notwithstanding any other provision of law to the contrary, nothing in this article shall be construed to restrict the right of a person to lawfully advertise, to use direct mail or otherwise communicate in a manner not within the above prohibition of solicitation or to solicit the business of anyone responding to such communication or otherwise initiating discussion of the goods or services being offered.

(c) Nothing herein shall be construed to prohibit general advertising.

*W.Va.Code* § 47–14–10 (1983).

Thus, the statute does not totally insulate the private residence from appellant's speech. With all of these avenues of communication left open, it would be difficult to conclude that the statute's measures are excessive.[15] Furthermore, the avenues left open confirm that the statute is narrowly drawn, to eliminate no more than the evils it seeks to remedy—fraud and invasion of privacy. *Frisby, supra,* —— U.S. at ——, 108 S.Ct. at 2502. And, while I agree with appellant that West Virginia's statute implicates appellant's first amendment rights, this implication is even more minimal than would be other restraints on its speech because personal solicitation "is a business transaction in which speech is an essential *but subordinate* component." *Ohralik, supra,* 436 U.S. at 457, 98 S.Ct. at 1919 (emphasis added). Therefore, I conclude that this statute's proscriptions are not excessive. See *May, supra,* (ban on all commercial door-to-door solicitation found not excessive).

This conclusion is easily reached in view of the important state interests present in this case. The West Virginia legislature has determined that the speech in question poses a serious threat of fraud and overreaching to its citizenry. *W.Va.Code*

---

**15.** Appellant again argues that these alternatives are not viable because they cannot be exploited profitably. This argument must be dismissed

because it is not supported by the evidence. *See* n. 7, *supra.*

§ 47–14–10(e) (1983). The Supreme Court has made it clear on several occasions that when a form of commercial speech is subject to abuse, a state may act to regulate. *Posadas, supra; In re R.M.J., supra; Ohralik, supra; Friedman v. Rodgers,* 440 U.S. 1, 99 S.Ct. 887, 59 L.Ed.2d 100 (1979).[16] Likewise, it is axiomatic that it is well within a state's police powers to act in protection of the privacy of the home. As another court has remarked: "when the fundamental right to privacy clashes with the right of free expression, the interest in privacy does not play second fiddle when the speech is merely intended to propose a commercial transaction." *Curtis, supra,* at 1300. Likewise, I refuse to consign the privacy of the home to the second chair.[17]

I conclude my discussion by observing that this presents a textbook case of the appropriate restraint of commercial speech. The state legislature has determined a mode of commercial speech to be inherently troublesome and has acted in a reasonable way to remedy these troubles. It imposed limited restraints on speech while preserving appellant's ability to advertise its product. Finally, the statute is necessitated by legitimate, important state interests. Thus, I cannot conclude that it offends the first amendment.

## V.

In sum, we unanimously hold that West Virginia's statute is not preempted by the FTC's Funeral Rule. A majority of the panel also concludes that its provisions do not violate the first amendment. Therefore, the district court is affirmed.

AFFIRMED.

KISER, District Judge, concurring:

I concur with the results reached by Judge Hall and in his opinion except as to his analysis of the First Amendment issue.

I write separately to point out that determining whether a regulation is aimed at the content of speech or the time, place, or manner in which speech is delivered is no easy task. In this case, unlike Judges Hall and Butzner (in his dissenting opinion in *Guardian Plans*), I think the regulations come down on the side of time, place, and manner. As Justice Stevens observed, "Any student of history who has been reprimanded for talking about the World Series during a class discussion of the First Amendment knows that it is incorrect to state that a 'time, place, or manner restriction may not be based upon either the content or subject matter of speech.'" *Consolidated Edison Co. of New York, Inc. v. Public Service Commission of New York,* 447 U.S. 530, 544–45, 100 S.Ct. 2326, 2337–38, 65 L.Ed.2d 319 (1980) (Stevens, J., concurring). Sometimes it is the very content of the speech that makes it inappropriate in a particular time or place. A student can talk about the World Series *after* history class.

Both state and federal governments have determined that the funeral industry needs regulating to prevent deceptive practices. In an industry where regulation is both appropriate and necessary, the government may have a strong interest in regulating speech. For example, speech is necessarily a part of many sales transactions. Regulation of certain speech may be an essential

---

**16.** Thus, my reasoning in this case is distinguished from the line of authority, exemplified by *Project 80's, supra,* which has invalidated blanket prohibitions of all door-to-door commercial solicitation. These cases have properly focused on the informational aspect of solicitation, *i.e.* that the disbursement of legitimate commercial information is essential in a free enterprise economy. The conclusions I have reached do not undercut this principle. I propose doing nothing more than upholding the restriction of a particular form of advertising that has been found to be potentially misleading.

**17.** My reasoning is not in conflict with *Optimist Club of North Raleigh, N.C. v. Riley,* 563 F.Supp. 847 (1982), or *Planned Parenthood League v. Attorney General,* 391 Mass. 709, 464 N.E.2d 55 (Mass.1984). In both cases, the court struck down blanket prohibitions on all charitable solicitation made by paid telephone operators. Here, the issue is commercial, not charitable speech, thus, less protection is due. Further, this is not a blanket prohibition of all commercial telemarketing, rather it is the prohibition of one type of solicitation particularly amenable to abuse.

part of a government regulation scheme for an entire industry.

Commercial speech, like other speech, is subject to reasonable time, place, and manner restrictions that serve a significant government interest and leave open ample alternative channels of communication. *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council,* 425 U.S. 748, 771, 96 S.Ct. 1817, 1830, 48 L.Ed.2d 346 (1976). Some time, place, and manner restrictions may be directed at speech on a particular topic, and yet such regulations are not necessarily "content-based." For example, the Supreme Court found that a restriction on the location of adult theaters was not content-based, because the regulation was aimed at the secondary effects of the theaters on the surrounding community. *See City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 47, 106 S.Ct. 925, 929, 89 L.Ed.2d 29 (1986).

The regulation of lawyers' solicitation provides a natural analogy to the regulation of funeral directors' sales pitches. Both situations offer the potential for trained professionals to overwhelm the unwary consumer. The Supreme Court has permitted the states to ban in-person soliciting by lawyers because of the special dangers presented by such speech. *Ohralik v. Ohio State Bar Association,* 436 U.S. 447, 457, 98 S.Ct. 1912, 1919, 56 L.Ed. 2d 444 (1978). Even though the ban on soliciting was aimed solely at lawyers, the Court did not subject the regulation to the rigorous scrutiny required for content-based regulation. In fact, the Court held that such regulations required *less* scrutiny:

> In-person solicitation by a lawyer of remunerative employment is a business transaction in which speech is an essential but subordinate component. While this does not remove the speech from the protection of the First Amendment, as was held in *Bates* and *Virginia Pharmacy,* it lowers the level of appropriate judicial scrutiny.

*Id.* at 457, 459, 98 S.Ct. at 1919, 1920. That the regulation of speech in *Ohralik* was permissible under a time, place, and man-

ner analysis becomes even more apparent when it is compared with *Bates v. State Bar of Arizona,* 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977). In *Bates,* Arizona sought to ban lawyer solicitation through advertising media. The Court struck down Arizona's regulation as being too broad but left open the question of whether a state could ban in-person solicitation. Then, in *Ohralik,* the Court addressed the question of in-person solicitation and found that a state's ban on this method of advertising was permissible. In both cases, the state regulations were aimed at lawyer solicitation of prospective clients, but the deciding difference was the manner of solicitation which was forbidden. From a comparison of these two cases, it seems to me that reasonable regulations governing the time, place, and manner of advertising by members of a regulated profession will not be subject to the heightened scrutiny applied to content-based regulations.

In my view, the West Virginia regulations are a permissible time, place, and manner restriction on the speech of funeral directors, a necessary part of a general scheme for regulating the funeral industry. As Judge Hall notes, the regulations leave open ample alternative channels of communication. If the regulations had banned *all* in-person soliciting in order to end abuses in the funeral industry, the regulations undoubtedly would be struck down as being too broad. *Cf. United States v. Kokinda,* 866 F.2d 699, 706 (4th Cir.1989). On the other hand, a more narrow regulation simply could not be an effective means of combatting the potential abuses of in-person solicitation. *See Ohralik,* 436 U.S. at 466, 98 S.Ct. at 1924. Thus, the West Virginia regulations are narrowly tailored to serve the significant state interest of preventing abuses in the funeral industry. I believe the regulations should be upheld as a valid time, place, and manner restriction.

BUTZNER, Senior Circuit Judge, concurring in part:

I concur in Part II of the court's opinion which holds that the Federal Trade Com-

mission's Funeral Rule does not preempt W.Va.Code § 47–14–1, *et seq.* (1983). I also concur in Part II n. 6 which holds that the district court properly rejected the claim that the statute violates the due process and equal protection clauses of the fourteenth amendment because it requires that 90% of the payments made for preneed contracts be placed in trust. In view of these rulings, it is unnecessary to decide whether the statute also infringes rights secured by the first and fourteenth amendments with respect to solicitation and telemarketing. Consequently I do not concur in Parts III, IV, and V.

National Funeral Service principally complains about the requirement for placing 90% of preneed contract payments in trust. The company's president testified that with overhead expenses of 35%, the 90% trust requirement made it impossible for the company to operate. He explained that even if there were no prohibition against solicitation, the company would be unable to conduct its business. The president's testimony is the basis of the litigation position that is stated in the company's brief:

> West Virginia Code § 47–14–5 further requires the trusting of ninety percent (90%) of all funds collected under the contract at the time when the funds are collected. This provision effectively allows only ten percent (10%) of the gross contract price for overhead, sales, and other current expenses including commissions to salespeople. Such a high trusting percentage effectively (and the Appellant submits intentionally) ceased the sale of preneed funeral contracts in the State of West Virginia. The minimal percentage permitted to be retained for the purposes of meeting sales, overhead, and other expenses totally precludes the operation of any large scale preneed sales organization and effectively stopped price and product competition and the dissemination of price and product information by preneed funeral sellers.

> \* \* \* \* \* \*

> The Appellant has been forced to cease all business operations and has in fact not sold any further preneed funeral goods or services under preneed contracts in the State of West Virginia since the implementation of West Virginia Code § 47–14–1.

Appellant's Brief pp. 6 and 7. At oral argument National Funeral Service insisted that it wanted a decision on its claim that the statute violated the first amendment. But it never retracted its position, unequivocally expressed by testimony and brief, that the trust requirement, without regard to the ban on solicitation, precluded it from doing business in the state.

Inasmuch as the company finds itself unable to conduct its business because of the trust requirement, the controversy over other provisions of the statute is mooted. This is so even though the district court found that the statute did not preclude companies from engaging in preneed business. Even if we were to decide the other issues in favor of National Funeral Service, our decision would be of no practical consequence to it, for in testimony and brief it has asserted in unmistakable terms its litigating position. In the context of this case, our views about telemarketing and other means of solicitation have only the academic significance of an advisory opinion.