CLEVELAND HOME IMPROVEMENT COUNCIL, Appellant,

v.

CITY OF BEDFORD HEIGHTS et al., Appellees.

[Cite as *Cleveland Home Improvement Council v. Bedford Hts.* (1996), 113 Ohio App.3d 814.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 68214.

Decided Aug. 21, 1996.

*Seeley, Savidge & Aussem, Keith A. Savidge* and *Carter R. Dodge,* for appellant.

*Charles E. Merchant* and *Katharine Lang Bettasso,* for appellees.

O'DONNELL, Judge.

Cleveland Home Improvement Council, d.b.a. Greater Cleveland Chapter of National Association of Remodeling Industry ("NARI"), appeals an order of the Common Pleas Court granting summary judgment in favor of the city of Bedford Heights and finding the city's uninvited door-to-door solicitation ordinance a constitutional limitation of commercial speech.

Appellant, an Ohio nonprofit corporation whose members engage in the business of residential remodeling and repair, filed a declaratory judgment action against the cities of North Olmsted, Maple Heights and Bedford Heights, challenging the constitutionality of the following Bedford Heights ordinance:

"733.01 PROHIBITION OF DOOR TO DOOR SOLICITATION.

"The practice of going in and upon private residences in the City, by solicitors, peddlers, hawkers, itinerant merchants and transient vendors of merchandise not having been requested or invited to do so by the owner or owners, occupant or occupants of such private residences for the purpose of soliciting orders for the sale of goods, wares, services, merchandise, periodicals and other articles or publications and/or disposing of and/or peddling or hawking the same is hereby declared to be a nuisance and punishable as provided in Section 733.99. (Ord. 76–45. Passed 3–2–76.)"

This legislation classifies a first offense as a third degree misdemeanor, subsequent offenses as first degree misdemeanors, and further provided:

"733.03 EXEMPTIONS.

"The prohibitions contained in this chapter shall not apply to any persons selling or delivering newspapers, to any duly authorized solicitor soliciting the purchase of goods, wares, merchandise or gifts for or on behalf of any recognized

educational, civic, religious or charitable organization nor to any person specifically exempted by law, except as to those provisions contained in this chapter relating to registration requirements of those hereby permitted to conduct such solicitations. (Ord. 76–163. Passed 10–19–76.)

"733.04    REGISTRATION REQUIRED.

"Registration is required for every person exempted by Section 733.03 who desires to engage in solicitation by means of calling upon places of residence or by means of direct personal contact in public places or upon public property. A registration certificate shall be obtained by an organization to cover each individual solicitor for the organization. Any peddling or soliciting which is carried on in connection with Section 733.03 is unlawful unless prior registration has been complied with as required herein. (Ord. 76–162. Passed 10–19–76.)"

On July 22, 1994, the city of Bedford Heights filed a motion with the trial court to dismiss the complaint, alleging that appellant lacked standing to pursue the action, and alternatively sought summary judgment on constitutional issues. Subsequently, appellant filed its own motion for summary judgment asking the court to declare that the solicitation ordinances in all three cities violated First Amendment protected rights of commercial speech.

On October 26, 1994, the trial court denied appellant's requested summary judgment and a week later published its opinion granting summary judgment in favor of the city of Bedford Heights. Appellant then voluntarily dismissed its case against both North Olmsted and Maple Heights and filed its notice of appeal seeking our review of the trial court's decision. Two errors are assigned:

"I.    The lower court erred in granting Bedford Heights' motion for summary judgment.

"II.    The lower court erred in denying NARI's motion for summary judgment."

On appeal, the city urges that appellant lacked standing to pursue declaratory judgment because no member of the Cleveland Home Improvement Council had ever been cited for violating its ordinance. The city relies upon *Ohio Contractors Assn. v. Bicking* (1994), 71 Ohio St.3d 318, 643 N.E.2d 1088, where the court considered whether that association had standing to pursue a cause of action since none of its members had submitted bids on a proposed project. The court cited *Hunt v. Washington State Apple Advertising Comm.* (1977), 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383, 394, for the proposition that "to have standing, the association must establish that its members have suffered actual injury." Accordingly, the Ohio Supreme Court found that the Ohio Contractors Association lacked standing because no contractor had submitted a bid and been rejected and, thus, no aggrieved contractor existed in that case.

■ We are persuaded, however, that the controlling precedent in this case is *Peltz v. S. Euclid* (1967), 11 Ohio St.2d 128, 40 O.O.2d 129, 228 N.E.2d 320, where the court stated at paragraph one of its syllabus:

"Where a municipal ordinance imposing criminal penalties upon a contemplated act will be enforced against a person if he proceeds with that act, such person has standing to test the validity, construction and application of such ordinance by an action for declaratory judgment, and it is unnecessary to demonstrate the existence of an actual controversy for such a person to incur a violation of the ordinance. (Section 2721.03, Revised Code.) (*Wilson v. Cincinnati* [1960], 171 Ohio St. 104 [12 O.O.2d 129, 168 N.E.2d 147], approved and followed.)"

Accordingly, we shall consider the matter presented on its merits.

Review of a matter involving summary judgment is governed by Civ.R. 56, which provides that this relief shall be rendered if the pleading, depositions, answers to interrogatories, written admissions, affidavits, transcript of evidence and written stipulations show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. No other evidence may be considered. Further, the rule states that summary judgment shall not be granted unless it appears from such evidence that reasonable minds can come to but one conclusion, which is adverse to the party against whom the motion is made.

Finally, the rule further states in subsection (E):

" * * * When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleadings, but his response, by affidavit or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not respond, summary judgment, if appropriate, shall be entered against him."

See, also, *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 662 N.E.2d 264, where the court limited *Wing v. Anchor Media, Ltd. of Texas* (1991), 59 Ohio St.3d 108, 570 N.E.2d 1095, in conformity with *Mitseff v. Wheeler* (1988), 38 Ohio St.3d 112, 526 N.E.2d 798, where the syllabus states:

"A party seeking summary judgment must specifically delineate the basis upon which summary judgment is sought in order to allow the opposing party a meaningful opportunity to respond."

In conformity with this standard of review, we examine the substantive law involving commercial speech.

In *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm. of New York* (1980), 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341, the court held that a regulation of

the New York State Public Service Commission which completely banned electric utility promotional advertising violated the First Amendment commercial speech rights of the utility. In that case, after citing *Virginia Pharmacy Bd. v. Virginia Citizens Consumer Council* (1976), 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346, which defined commercial speech as an expression related solely to the economic interests of the speaker and its audience, the court stated that the First Amendment's concern for commercial speech is based on the informational function of advertising and then, at 566, 100 S.Ct. at 2351, 65 L.Ed.2d at 351, set forth the following *Cent. Hudson* four-step procedure to analyze commercial speech:

"At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest."

■ Thus, we will analyze each of these steps sequentially in this case. Regarding the first, we note that the trial court stated in its written opinion:

"It is undisputed or at least *no evidence was submitted to the contrary* that under the first prong, the plaintiff is engaged in a lawful activity and the information provided by the solicitor to the consumer is not misleading." (Emphasis added.)

This finding is further supported by our review of the record, which reflects that both parties to this appeal sought summary judgment relief in the trial court—each, therefore, representing to the trial court that no genuine issues of material fact existed in the case. In fact, in its motion for summary judgment submitted to the trial court, appellant stated, "Even if all the facts as stated by the Defendants are construed most strongly in their favor and assumed to be true, *there remains no genuine issue as to any material fact * * *.*" And in its conclusion, appellant asserted in that motion, *"Defendants * * * failed to create any genuine issues of material fact."* (Emphasis added.)

Thus, we agree with the trial court regarding this part of the *Cent. Hudson* analysis.

Regarding the second step, whether the governmental interests are substantial, the trial court's opinion supports a determination of substantial interest in promulgating the ordinance, where, as the court notes, "the city determined [that] unregulated door-to-door solicitation unreasonably raised the risk of crime;

was the cause of continual annoyance and harassment; and unreasonably invaded the privacy of city residents."

■ Further, we believe that the city's interests in protecting its citizens are apparent from the circumstances of this case and therefore satisfy the city's obligation under *Cent. Hudson* and Civ.R. 56. It is well established, for example, that a city may regulate solicitation as a necessary step in securing the safety of its citizens. As the court in *Breard v. Alexandria* (1950), 341 U.S. 622, 71 S.Ct. 920, 95 L.Ed. 1233, noted:

"To the city council falls the duty of protecting its citizens against the practices deemed subversive of privacy and of quiet. A householder depends for protection on his city board rather than churlishly guarding his entrances with orders forbidding the entrance of solicitors." *Id.* at 640, 71 S.Ct. at 931, 95 L.Ed. at 1246–1247. See, also, *Project 80's, Inc. v. Pocatello* (C.A. 9, 1987), 876 F.2d 711, 714; *Wisconsin Action Coalition v. Kenosha* (C.A. 7, 1985), 767 F.2d 1248, 1251.

Indeed, in *Breard, supra*, the court stated, "Unwanted knocks on the door by day or night are a nuisance, or worse, to peace and quiet." *Id.*, 341 U.S. at 627, 71 S.Ct. at 924, 95 L.Ed. at 1239. Hence the city's "interest in protecting the well-being, tranquility, and privacy of the home is certainly of the highest order in a free and civilized society." *Carey v. Brown* (1980), 447 U.S. 455, 471, 100 S.Ct. 2286, 2296, 65 L.Ed.2d 263, 276.

Because the trial court determined and we agree that the speech here concerns lawful activity and is not misleading and the asserted governmental interest is substantial, it is incumbent on us to consider the third and fourth steps in the analysis, *i.e.*, whether the ordinance directly advances but is not more extensive than necessary to serve the stated governmental interests.

The trial court specifically found that the ordinance directly advanced the interests of "protecting homeowners from uninvited and harassing solicitation of home remodeling services and of deterring uninvited individuals from entering *private property* for the purpose of canvassing the premises to perpetrate a burglary or other crime." (Emphasis added.) We agree. Regulation of door-to-door solicitation has been found to directly advance governmental interests in protecting privacy and preventing crime. See *Project 80's, supra*, 876 F.2d at 714.

Further, in accord with Civ.R. 56, which directs a court to review the pleadings to determine the existence of factual issues, we observe that Bedford Heights urged that "door to door solicitation directly caused a greater risk of crime and constituted an annoyance to the city residents and *no alternative could more directly advance the city's interest other than eliminating the cause of the harm.*" (Emphasis added.) Although the city did not present further evidence

to support its claim, that fact alone does not foreclose summary judgment given the procedural posture of this appeal. Both parties sought summary judgment, representing to the court that there were no genuine issues of material fact and that judgment could be rendered as a matter of law. Nor has appellant questioned the sufficiency of the city's claimed interests in protecting its citizens, only that the means used to advance those interests are more extensive than necessary to achieve those ends.

Further, in *Posadas de Puerto Rico Assoc. v. Tourism Co. of Puerto Rico* (1986), 478 U.S. 328, 106 S.Ct. 2968, 92 L.Ed.2d 266, the court considered the constitutionality of a Puerto Rican statute restricting advertising of casino gambling to Puerto Rican residents. Rejecting the challenge that other kinds of gambling, *viz.,* horse racing, cockfighting and the lottery, were not so restricted, the court stated that the casino restrictions directly advanced the legislature's interest in reducing demand for games of chance, and specifically, casino gambling. The court then stated at 343, 106 S.Ct. at 2977–2978, 92 L.Ed.2d at 281–282:

"In other words, the legislature felt that for Puerto Ricans the risks associated with casino gambling were significantly greater than those associated with the more traditional kinds of gambling in Puerto Rico. In our view, the legislature's *separate classification of casino gambling, for purposes of the advertising ban, satisfies the third step of the Central Hudson analysis.*" (Emphasis added.)

Similarly, we conclude, based upon the record presented to us and the foregoing analysis, that the Bedford Heights City Council's separate classification of uninvited door-to-door solicitation by those engaging in commercial speech directly advances its substantial governmental interests of reducing the risk of burglary and other crime, avoiding harassment and annoyance, and protecting the privacy of its citizens and, therefore, meets this third step in the *Cent. Hudson* analysis.

Concerning the fourth part of the *Cent. Hudson* test, *i.e.,* whether the ordinance is more extensive than necessary to serve the city's interests, Justice Scalia, writing for the court in *Bd. of Trustees of State Univ. of New York v. Fox* (1989), 492 U.S. 469, 480, 109 S.Ct. 3028, 3034–3035, 106 L.Ed.2d 388, 403–404, further defined this requirement:

"[W]e have not gone so far as to impose upon [regulators] the burden of demonstrating * * * that the manner of restriction is absolutely the least severe that will achieve the desired end. What our decisions require is a ' "fit" between the legislature's ends and the means chosen to accomplish those ends,' *Posadas, supra* [478 U.S.] at 341 [106 S.Ct. at 2977, 92 L.Ed.2d at 281]—a fit that is not necessarily perfect, but *reasonable;* that represents not necessarily the single best disposition but one whose scope is 'in proportion to the interest served,' *In*

*re R.M.J., supra* [455 U.S. 191] at 203 [102 S.Ct. 929, at 937 [71 L.Ed.2d 64 at 74]; that employs not necessarily the least restrictive means but, as we have put it in the other contexts discussed above, a means narrowly tailored to achieve the desired objective. Within those bounds we leave it to governmental decisionmakers to judge what manner of regulation may best be employed." (Emphasis added.)

Applying these explanatory words to the *Cent. Hudson* analysis, the trial court found the Bedford Heights ordinance to be reasonable in that it did not abridge the freedom of speech or unduly burden customer solicitation. We agree that the ordinance is narrowly tailored to achieve the objectives of protecting privacy, reducing harassment and preventing crime.

Our determination conforms to the idea that this ban on commercial solicitation relates to the *method* of communication as opposed to the *message* intended to be conveyed because it is not a content-based ban. The Supreme Court articulated this distinction in *Metromedia, Inc. v. San Diego* (1981), 453 U.S. 490, 101 S.Ct. 2882, 69 L.Ed.2d 800, where, in the plurality opinion written by Justice White, the court noted at 502, 101 S.Ct. at 2890, 69 L.Ed.2d at 811:

"Billboards, then, like other media of communication, combine communicative and noncommunicative aspects. As with other media, the government has legitimate interests in controlling the noncommunicative aspects of the medium * * * but the First and Fourteenth Amendments foreclose a similar interest in controlling the communicative aspects."

This statement cogently sets forth the reason why the trial court in our case correctly ruled that this legislation meets the reasonable fit test of *Cent. Hudson* and is tailored to achieve the stated objectives of reducing the risk of crime, eliminating harassment, and protecting privacy of homeowners. This ordinance fits those ends in that it bans the *method* of marketing, a noncommunicative aspect of communication, not the content of the communication, thus leaving other forms of marketing and advertising available to appellant to utilize in delivery of its message: local newspapers, radio, television, and mail. Clearly, the communicative aspects of appellant's message are not infringed by this legislation, which does not seek to suppress the content of the speech but rather only to control the method of its delivery.

We recognize that *Project 80's, supra*, 876 F.2d 711, reached a contrary result when considering a similar ordinance involving an Idaho corporation providing work programs for teenage youth who sold confectioneries door-to-door. The Supreme Court, after deciding *Fox, supra*, 492 U.S. 469, 109 S.Ct. 3028, 106 L.Ed.2d 388, considered *Project 80's* and remanded the cause to the circuit court for reconsideration of the fourth prong of the *Cent. Hudson* test in light of its *Fox* pronouncements. On remand, the circuit court quoted its first opinion where

it had detailed less restrictive means available to cities to regulate door-to-door solicitation including use of a posted sign. The court in its second opinion, however, determined that a required "Solicitors Welcome" sign was "not permissible" and determined that commercial speech restrictions which disregard far less restrictive and more precise means are not narrowly tailored. Hence, the court considered but never actually applied the *Fox* "reasonable fit" test.

Here, the ban on door-to-door solicitation is a reasonable fit because it does not suppress appellant's speech or the ability to communicate proposals for profit-making transactions using other media of communication. The exceptions carved out by the Supreme Court for door-to-door solicitation relate only to religious, political and charitable rights, which receive greater constitutional protection than the purely commercial speech involved in this appeal. See, *e.g., Village of Schaumburg v. Citizens for a Better Environment* (1980), 444 U.S. 620, 100 S.Ct. 826, 63 L.Ed.2d 73 (charitable solicitation including dissemination of views, ideas, and advocacy of causes are within First Amendment protection); *Cantwell v. Connecticut* (1940), 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (solicitation of contributions of any of value by religious, charitable or philanthropic organizations involves interests protected by First Amendment); *Hynes v. Mayor of Oradell* (1976), 425 U.S. 610, 96 S.Ct. 1755, 48 L.Ed.2d 243 (same); *Norton Outdoor Advertising, Inc. v. Arlington Hts.* (1982), 69 Ohio St.2d 539, 23 O.O.3d 462, 433 N.E.2d 198 (ordinance restricting billboard advertising to product sold or business conducted on premises held unconstitutional because it excluded all noncommercial messages).

Finally, we observe that inasmuch as this matter arose on cross-motions for summary judgment with both parties having independently moved for summary judgment, each, by implication, has averred that no genuine issues of material fact exist. Thus, the single question for our resolution is whether either party is entitled to judgment as a matter of law.

In accordance with the foregoing analysis of *Cent. Hudson,* we affirm the judgment of the trial court because the Bedford Heights ordinance directly advances substantial governmental interests and is tailored to achieve desired objectives.

Since we have affirmed the judgment of the trial court resolving these issues in favor of the city of Bedford Heights, by implication, we have overruled the assignment of error denying summary judgment to appellant. In our view, the trial court correctly denied this relief to appellant because the city is entitled to judgment as a matter of law. The judgment of the trial court is therefore affirmed.

*Judgment affirmed.*

PATTON, C.J., concurs.

PATRICIA ANN BLACKMON, J., dissents.

PATRICIA ANN BLACKMON, Judge, dissenting.

I respectfully dissent from the majority opinion. The majority opinion concludes that the Bedford Heights ban on door-to-door solicitation is constitutional under the First Amendment. I, of course, believe that the ban is unduly constrictive because it cuts off the flow of information to consumers in a way that is offensive to the First Amendment and is, therefore, unconstitutional.

In door-to-door solicitation cases, the United States Supreme Court has held that flat bans of this nature are unduly constrictive. In weighing the First Amendment value over the restriction, the United States Supreme Court has concluded that where less restrictive alternatives exist, the First Amendment right to speak will win out. In fact, the court urged that where the goal of the governmental regulation is privacy, homeowners are better monitors of their privacy needs. Consequently, a flat-out door-to-door solicitation ban is unconstitutional. *Martin v. Struthers* (1943), 319 U.S. 141, 63 S.Ct. 862, 87 L.Ed. 1313. The United States Supreme Court went on to outline some less restrictive alternatives. For example, it urged that the homeowner could utilize "do not disturb—no solicitation" signs. As a less restrictive alternative, the government could make it a crime to ring door bells where the sign existed. This, the court urged, was much more palatable than banning protected speech.

The majority states that the Bedford Heights ban survives because it is content-neutral. Constitutional content-neutral scrutiny will not save a ban that leaves too little breathing space for communication to flow and too little space for the listener to access the information. In fact, Justice Kennedy, writing for the majority, concluded that he seriously doubted whether content-neutral scrutiny applied in an area where the restriction flatly banned commercial speech. *Edenfield v. Fane* (1993), 507 U.S. 761, 773, 113 S.Ct. 1792, 1801, 123 L.Ed.2d 543, 557. In *Edenfield*, Justice Kennedy went on to say that even if it does apply, the challenged restriction must be of a type that serves a substantial state interest in a direct and effective way. *Id.* I do not believe that the ban advances Bedford Heights' interest in a direct and effective way. It is this failure that is at the heart of my dissent, which is the second prong of *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm. of New York* (1980), 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341. However, before I proceed in that direction, I cannot resist the temptation to advance what I believe is the best and most sensible approach to bans that restrict the dissemination of lawful, nonmisleading information. Foremost, as a Brennanite, I believe that any ban on commercial speech that deprives a consumer of accurate, lawful, nonmisleading information should be strictly

scrutinized. See Justice Brennan's dissent in *Posadas de Puerto Rico Assoc. v. Tourism Co. of Puerto Rico* (1986), 478 U.S. 328, 106 S.Ct. 2968, 92 L.Ed.2d 266 (Brennan, J., dissenting).

Under a strict scrutiny analysis, Bedford Heights would be required to show a compelling interest for the ban. Compelling-interest scrutiny means the government has to show the ban is necessary to achieve a compelling governmental interest. A compelling interest is more than a governmental desire to do something different to combat a harm, and it must be necessary. A necessary regulation is more than merely appropriate. Because of the necessary standard, strict scrutiny is often fatal to most well-meaning regulations, like the one in this case. The Bedford Heights ban should undergo this strict scrutiny because its ban is aimed at lawful, nonmisleading information that its citizen-consumers should be allowed to access. The value at issue is the First Amendment right to speak and right to access. Above all, the First Amendment should come first.

I advance this view because of the recent decision by the United States Supreme Court in *44 Liquormart, Inc. v. Rhode Island* (1996), 517 U.S. ——, 116 S.Ct. 1495, 134 L.Ed.2d 711. In *44 Liquormart,* Justice Stevens said that when a state entirely prohibits the dissemination of truthful, nonmisleading, commercial messages for reasons unrelated to a claimed interest, "there is far less reason to depart from the rigorous review that the First Amendment generally demands." *Id.* at ——, 116 S.Ct. at 1507, 134 L.Ed.2d at 726.

Justice Thomas, on the other hand, in his concurrence in *44 Liquormart,* 517 U.S. at ——, 116 S.Ct. at 1515, 134 L.Ed.2d at 736, says bans of this nature are *per se* unconstitutional when the government seeks to keep information from its citizenry, which is lawful and nonmisleading. An ignorant, uninformed public is much more dangerous than the evil the government is targeting. I rather think that Justice Thomas's *per se* approach should be applied in all cases where the information is lawful and nonmisleading. However, I am constrained to view this case under the state of the present law, and I believe under most of the commercial speech cases this ban by Bedford Heights does not pass First Amendment scrutiny. See *Florida Bar v. Went For It* (1995), 515 U.S. 618, 115 S.Ct. 2371, 132 L.Ed.2d 541; *Cent. Hudson, supra.*

In fact, I agree with the majority that under the present law *Cent. Hudson* is the standard. I believe, however, that *Cent. Hudson* resolves the facts of this case in favor of the First Amendment and against the Bedford Heights ban.

In this case, Bedford Heights, without evidence, advances two targeted interests: privacy and crime. It admits that the standard harms, *i.e.*, fraud, dishonesty, coercion, and compromise are not its targeted aims. It is also true that the solicitation has not been challenged as unlawful or misleading. In fact, Bedford Heights concedes that it is lawful and nonmisleading information. Thus, the

issue is whether this ban is legal under the second and third prongs of *Cent. Hudson.* The burden of justifying the regulation under both prongs is on Bedford Heights, and from a review of the record, it has failed under both.

In *Florida Bar,* Justice O'Connor, writing for the majority, reaffirmed the *Cent. Hudson—Edenfield* burden of proof standard and went on to define intermediate judicial scrutiny under *Cent. Hudson* as requiring that the government (1) asserts a substantial interest in support of its regulation, (2) establishes that the restriction directly and materially advances that interest, and (3) demonstrates that the regulation is narrowly drawn. *Id.* at 624, 115 S.Ct. at 2376, 132 L.Ed.2d at 549. In defining the second prong of *Cent. Hudson,* the United States Supreme Court observed:

"[A] governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restrictions will in fact alleviate them to a material degree." *Id.* at 626, 115 S.Ct. at 2377, 132 L.Ed.2d at 550.

In *Edenfield,* a *Cent. Hudson* second prong case, the United States Supreme Court held that the burden of proof is a strong one because the government has to show actual effect on the asserted harm. In *Edenfield,* the harm was the dangers of fraud, overreaching, and compromise. The court held no statistical data or studies were introduced to suggest personal solicitation created dangers of fraud, overreaching, or compromised independence that the regulator seemed to fear. *Id.,* 507 U.S. at 771, 113 S.Ct. at 1800, 123 L.Ed.2d at 555. Moreover, no anecdotal evidence was offered to substantiate that the feared harm was being alleviated by the ban. "Not even Fane's own conduct," observed the United States Supreme Court, suggested that the ban was justified. *Id.,* 507 U.S. at 771, 113 S.Ct. at 1800, 123 L.Ed.2d at 556.

In *Edenfield,* the government provided an affidavit that contained a series of conclusory statements of harms. The United States Supreme Court found the affidavit woefully inadequate to satisfy *Cent. Hudson*'s second prong. Thus, the court held the ban illegal and struck it down as paternalistic and prophylactic.

*Edenfield,* thus, outlined a set of evidentiary guidelines that might meet the First Amendment test. The regulator could offer statistical evidence. This evidence could be used to show the claimed dangers or asserted harms. It could offer anecdotal evidence to show that the harm has been alleviated. This evidence would substantiate that the government's interest is directly and materially advanced by the ban. Finally, the United States Supreme Court stated that the regulator could look to the solicitor's conduct to show specific bad conduct. Consequently, under *Cent. Hudson—Edenfield,* the second prong is not sustained unless the regulator can show that actual harm either has or will most

likely occur and that the ban has had an actual effect on the harm. Bedford Heights has failed on this standard.

Here, Bedford Heights has in its pleadings (no affidavits) listed a series of conclusory opinions by its lawyer about privacy and crime deterrence. Under *Edenfield,* this is not sufficient. If the affidavit in *Edenfield* was deemed woefully inadequate, certainly the conclusory pleadings of a lawyer are equally so.

Furthermore, Bedford Heights has not documented any evidence of NARI's conduct or door-to-door solicitation for home repair and remodeling in general that would lead one to believe that privacy is violated or crime increased.

Bedford Heights's overall argument is that solicitation is inherently bad, a premise flatly rejected in *Edenfield.* In fact, the opposite is true. Door-to-door solicitation provides opportunity for the consumer to see first-hand the product or services being promoted. Some will welcome it and others will not. Those who do not can post a sign forbidding the ringing of their door bell or a sign that says "no soliciting." A private citizen's regulation of solicitors is totally different from a city banning all solicitation and is more acceptable under *Cent. Hudson.* In my opinion Bedford Heights has not fulfilled its obligation under the second prong. Generally, a *Cent. Hudson* second prong failure is fatal to a case. However, for argument's sake, I will review the third prong.

The most recent third prong case to come out of the United States Supreme Court is the *44 Liquormart* case, 517 U.S. ——, 116 S.Ct. 1495, 134 L.Ed.2d 711. In *44 Liquormart,* Justice O'Connor found failure under *Cent. Hudson's* third prong when the ban is more extensive than necessary to serve the state's interest. *Id.* at —— – ——, 116 S.Ct. at 1520–1523, 134 L.Ed.2d at 743–747. She explained that the narrowly drawn fit must be a "fit between the legislature's goal and method, 'a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served.'" *Id.* at ——, 116 S.Ct. at 1521, 134 L.Ed.2d at 744, citing, *Bd. of Trustees of State Univ. of New York v. Fox* (1989), 492 U.S. 469, 480, 109 S.Ct. 3028, 3035, 106 L.Ed.2d 388, 403.

In *Florida Bar* (a second–prong case) she had suggested in her analysis on the third prong that the less burdensome analysis is a relevant factor to be considered. *Id.* at 632, 115 S.Ct. at 2380, 132 L.Ed.2d at 554. In *44 Liquormart* she said that "[t]he availability of less burdensome alternatives to reach the stated goal signals that the fit between the legislature's ends and the means chosen to accomplish those ends may be too imprecise to withstand First Amendment scrutiny." *Id.,* 517 U.S. at ——, 116 S.Ct. at 1521, 134 L.Ed.2d at 744.

Here, there are less burdensome alternatives to reaching Bedford Heights' goal than burdening speech. For example, the criminal law of the state is one

way to deter crime, and consumers are better judges of their own privacy interests. Those who are housebound may want the information. Furthermore, it is unreasonable to believe that privacy is enhanced by prohibiting one group of lawful solicitors (commercial) in the name of privacy while allowing another group or groups such as here. Under the law restricting door-to-door solicitations, Bedford Heights provided exemptions for educational, charitable, and religious groups and newspapers.

The majority's position is that the ban is a reasonable fit because it restricts only the method and not the message. In *Edenfield*, this argument was advanced to justify the second prong and here it is advanced by the majority to justify the third prong. The United States Supreme Court in *Edenfield* said that it seriously doubted whether this position applied to this area. 507 U.S. at 773, 113 S.Ct. at 1801, 123 L.Ed.2d at 557. It raised the question of whether a flat ban on commercial solicitation could be regarded as a content-neutral time, place, or manner restriction. If it is, the *Edenfield* court concluded, the state would still have to establish the second prong. *Id.*, 507 U.S. at 773, 113 S.Ct. at 1801–1802, 123 L.Ed.2d at 557. Likewise, in this case, Bedford Heights still has to show that the ban is a reasonable fit. This it has not done. The fact that Bedford Heights has banned some activity and exempted others shows that its position on privacy and crime deterrence is weak. Therefore, under *44 Liquormart*, the fit is not narrowly drawn.

A reasonable fit under the third prong is a matter of precision. Precision exists when there are no less burdensome alternatives to reach the stated goals. Justice O'Connor in *44 Liquormart* held that when less burdensome goals are available this should signal that the fit between the ends and means is too imprecise to withstand First Amendment scrutiny. *Id.*, 517 U.S. at ——, 116 S.Ct. at 1521, 134 L.Ed.2d at 743–744.

A reasonable fit in her opinion was most likely to exist when the restricted communication could be channeled through some other means. *Id.* She did not indicate what those other channels should look like and if the First Amendment would be satisfied by saying to the speaker, "Go find another way to get your message out, this one is closed to you."

It is an easier, cleaner case when the justification for the restriction on speech is so unrelated to the goal and the other channels available to the speaker are foreclosed. Restrictions of this nature, in Justice O'Connor's opinion, would be arbitrary.

Our concern, however, is what is a reasonable fit when the city has available less burdensome alternatives and the speaker equally has other avenues to get its message out, even if those avenues are more costly. For example, advertising by mail might be an alternative. In my opinion, even under these facts the First

Amendment suffers. For the small businessperson this other channel is not only costly but infringes on his right to speak. At the same time, it impedes the listeners' right to access information for a goal that appears disproportionate to the means used.

Ordinarily, I would have been in favor of returning the case to the trial court to allow Bedford Heights the opportunity to prove the second and third prongs of *Cent. Hudson.* However, because I do not believe it can, I am of the opinion that summary judgment should have been entered for NARI.